[No. S175615. Feb. 28, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTURO JESUS HERNANDEZ, Defendant and Appellant.

**COUNSEL**

Gail E. Chesney, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Donald E. DeNicola, Deputy State Solicitor General, Laurence K. Sullivan, Rene A. Chacon, Joan Killeen and Nanette Winaker, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CORRIGAN, J.—In *People v. Stevens* (2009) 47 Cal.4th 625, 638 [101 Cal.Rptr.3d 14, 218 P.3d 272] (*Stevens*), we held that the stationing of a courtroom deputy next to a testifying defendant is not an inherently prejudicial practice that must be justified by a showing of manifest need. We explained, however, that the trial court must exercise its own discretion and determine on a case-by-case basis whether such heightened security is appropriate. (*Id.* at p. 642.) Here, the trial court did not make a case-specific decision but instead deferred to a general policy when it stationed a deputy at the witness stand during defendant's testimony. The court erred, but the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] (*Watson*).

## BACKGROUND

Deva Belarde first met defendant outside the senior center in Antioch where she did volunteer work. About a week and a half later she saw him outside Lone Tree Liquors. She invited defendant to her house because he looked tired and dirty and she thought he might be hungry. Belarde said she did this "a lot of times with people," and defendant "seemed to be friendly." They walked to her house, drank, and talked for 20 or 25 minutes. Defendant left when Belarde's fiancé asked him to go.

Around 10:00 p.m. the next night, March 11, 2007, Belarde saw defendant sitting outside the same liquor store. He was drinking beer and asking people for money. Belarde sat and talked with defendant for more than an hour. She drank from a half-pint of vodka and from a beer that defendant bought her. Belarde had also consumed one 40-ounce beer around 2:00 p.m. and another around 6:00 p.m. She did not begin feeling intoxicated until she drank the vodka. Defendant eventually left for the bus stop. Belarde followed. She thought she should accompany defendant because he was "staggering somewhat." Defendant, however, wanted to walk alone. Belarde walked with defendant and put her hand on his shoulder. At one point, defendant loudly insulted Belarde and accused her of being a prostitute. Upset, she pushed him and turned to walk away. Defendant grabbed her by the arm, turned her around, and punched her in the left eye. Belarde became dizzy and shoved defendant from behind. Defendant shoved back, hit Belarde on the side of the face with a "stick" or "branch," then ran off. Belarde fell down bleeding. She managed to get up and walk to a nearby gas station, where she fell again. She later identified the branch defendant had used to hit her.

Antioch Police Officer B.J. Hewitt arrived at the Valero gas station on Lone Tree Way about 10:25 p.m. Several officers were already on the scene

and an ambulance was departing. After a brief search, Hewitt and other officers found defendant sitting between some shrubs, 200 to 300 yards from the gas station. His knuckles were bleeding, his forearm was scraped, and he smelled of alcohol. He was arrested without incident.

Belarde testified that she did not have a weapon with her and did not punch, kick, or slap defendant or try to take his wallet. She was 49 years old, stood four feet 11 inches tall, and weighed about 155 pounds. Defendant was five feet six inches tall and 175 pounds. The amount of alcohol Belarde had consumed that day was normal for her, and she did not feel "out of control." Although Belarde denied having blackouts or seizures related to alcohol consumption, her medical records reflected several such incidents. She had been unemployed for approximately three years. On cross-examination, Belarde did not recall many details about statements she made to medical and police personnel after the incident. She explained she had been "blocking out things" and trying to forget the incident. She did not think alcohol had affected her memory.

Paramedic Jennifer Matthews treated Belarde at the scene. Belarde said she had been hit once in the face with "a stick or a branch . . . by a man who was trying to rob her." Belarde said she had consumed a quart of beer. Belarde appeared upset but not confused. She had bruising and swelling around her left eye and lip and two cuts in those areas. Belarde told the paramedic she had not lost consciousness. Photographs taken after the incident showed swelling and bleeding around Belarde's left eye, but the injuries did not require stitches or surgery. At trial, she still felt swelling and pain to the touch on her cheekbone and temple. She had difficulty sleeping and continued to feel an "extreme amount of stress" from the incident. Contrary to what she told the paramedic at the scene, Belarde testified that she lost consciousness on the night of the assault, though she did not know for how long.

When Officer Hewitt took a statement from Belarde at the hospital, she smelled strongly of alcohol and appeared "very upset, traumatized" from the incident. She was shaking and her face was bruised and bleeding. In an interview that was played for the jury, Belarde said defendant had gotten drunk and wanted to go home to his daughter's house. When she tried to walk him to the bus, he "snapped" and hit her in the face. She said defendant hit her three to five times with his fists and then once with a stick. Belarde denied asking defendant for money, saying defendant had tried to borrow money from her.

Hewitt looked for the stick along the route Belarde described but did not find it. The next day, Antioch Police Officer Steve Bergerhouse searched the area where the assault occurred. Near the assault site, he found one long

stick, three to four feet long and half an inch in diameter. He found a shorter stick, about a foot long and three-quarters of an inch across, on an embankment behind the Valero gas station. This stick did not match the nearby trees. Belarde identified the shorter stick as the one used in the assault. There was no blood on the stick and it was not tested for DNA.

Officer Bergerhouse interviewed Belarde on March 19. She seemed "frail" and "very shaky" but did not smell of alcohol. Her left eye was swollen closed, the left side of her face was bruised, and her hands trembled. Belarde told the officer that defendant said he had $50 and had heard that she was a prostitute. At one point, defendant "snapped" and began punching her. She tried to cover her face and did not hit back. Defendant then picked up a wooden stick and hit her face with it. Officer Bergerhouse acknowledged that there were some inconsistencies between what Belarde told him and the statements she made to Officer Hewitt and to medical personnel. Bergerhouse did not ask Belarde about the inconsistencies. In his experience, victims' stories "tend to waiver" in the retelling. Belarde's injuries, statements, and medical records were consistent with what Bergerhouse found during his investigation, and her statements to him were generally consistent with what she told Officer Hewitt days earlier.

Defendant was charged with one count of assault with a deadly weapon and with force likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(1).) A personal infliction of great bodily injury clause was attached to that count. (Pen. Code, § 12022.7, subd. (a).) The information alleged that the charged offense was a serious felony within the meaning of Penal Code section 1192.7, subdivision (c).

At trial, defendant's version of the events differed significantly from Belarde's. He testified that Belarde first approached him two or three days before March 11, 2007, when he was drinking a beer and panhandling outside Lone Tree Liquors. After they drank and talked, he went to her house but stayed no longer than half an hour. On March 11, after he spent time drinking and panhandling with Belarde outside the liquor store, defendant decided to leave because Belarde was "getting loud." He testified he had consumed two 16-ounce beers over the course of the day. When defendant started to walk to a nearby bus stop, Belarde followed, hooking her arm through his. She asked him to give her money but he refused. She "paw[ed]" at him and kept putting her arm around his waist after he pushed it away. Belarde repeated her request for money, telling defendant he was a "nice guy" and "making motions" toward the wallet in his back pocket. When defendant pushed her away, she became angry and called him names. Defendant put out his arm to keep Belarde away but she pushed it aside and reached for his wallet. He got mad and pushed her "pretty much harder than before," and she "went down

on one knee." Defendant tried to walk faster but Belarde "just came at me just wild, screaming," hitting his back and reaching for his wallet. Angry, he turned and grabbed Belarde in a headlock, but she broke free. She came at him again, "swinging wildly and then yelling all kinds of stuff." Defendant testified that he grabbed Belarde by the back of the neck and her jeans and "threw her on her face." He explained he was "pretty pissed" and "just slammed her, threw her." He saw her land on her face but "didn't mean to do that." When Belarde stood, she was bleeding and swearing. Defendant denied punching Belarde or "throw[ing] any blows" and denied having used the stick she identified. Defendant agreed that Belarde sustained "serious injuries" but insisted he was defending himself and did not intend to cause them. Soon, a group of people approached from a nearby gas station. Defendant panicked, ran down the street to a church parking lot, and hid behind some bushes. He feared that he would be arrested and no one would believe his story.

In a videotaped interview shown to the jury, defendant admitted he hit Belarde but claimed he acted in self-defense. He said he did not know Belarde and insinuated that she was a prostitute who had pursued him. He told the police Belarde had dragged him and chased him down the block and also claimed Belarde had tried to stab him, but at trial he admitted these statements were lies. Defendant initially told the police he had bloodied his knuckles in a fall, but at trial he said he scraped them when crawling through bushes.

Defendant took the witness stand near the end of an afternoon. A courtroom deputy followed him to the stand and stood behind him while he testified. This procedure had not been mentioned or discussed with the attorneys beforehand. Defense counsel did not object to the deputy's presence that afternoon but raised the issue before defendant's testimony resumed the following morning. Counsel explained she did not object before because she was afraid of highlighting the issue for the jury. She protested that the deputy's stationing was "inappropriate" because defendant was "the only witness who . . . had an armed guard behind him when he testified." Counsel said she had never seen this procedure used "[i]n the 50 or so trials [she had] done." The court countered: "I've seen it happen in every trial I've ever done and that is because of security. And the defendant, as all defendants, even in a petty theft, if they sit there, a bailiff is supposed to sit behind them for security of the jury, for security of everyone." When counsel complained there had been no showing defendant was a security risk and compared the deputy's presence to shackling, the court disagreed, noting defendant was accused of aggravated assault "with a very bad injury." Referring to defendant's testimony the previous day, the court stated, "I was actually afraid you were going to have him stand up and point to something, and he would get

really close to a juror." The court concluded, "No, the deputy will sit back there. He's not shackled, nothing. It's just what happens in every case that I've ever tried."

Defense counsel objected that the deputy's presence was "highly prejudicial" and asked that the court "at least make an individualized finding" that the security measure was warranted based on defendant's "own individual factors, and not just because he's here and charged with a crime." Counsel noted that defendant had not behaved violently while in custody or during court proceedings, and in fact he had no history of violence except for the alleged incident with Belarde. Because nothing else suggested that defendant had a violent disposition, counsel argued it was highly prejudicial for him to walk to the stand accompanied by an armed guard. The court responded: "Well, I disagree, and it's a discretionary call. And he had an 18-page rap sheet. And I think he deserves what every defendant deserves, and that is security for himself and for all the rest of us." Counsel protested that many of the offenses on the rap sheet were restraining order violations arising from defendant's relationship with his ex-wife. The court responded that these violations indicated defendant's "inability to follow the orders of the Court," a fact that was "[k]ind of important." When asked if it had reviewed the restraining order violations to see whether defendant had acted violently, the court responded, "I don't need to. He—what he does is he does not follow the orders of the Court."

After defendant testified, his attorney asked the court to read the jury a modified version of CALCRIM No. 204 that would instruct them to ignore defendant's custodial status. The court refused, observing that defendant had not been shackled or restrained, but rather was sitting in court "in plain clothes" and "reading a book." Despite the absence of this instruction, defense counsel explained to the jury in closing argument that defendant's custodial status was irrelevant. She emphasized that although defendant was "the only person who ha[d] an armed guard standing behind him" when he testified, and this seemed to communicate that he was guilty, it was the jurors' duty to ignore these circumstances and decide the case by impartially examining the evidence and applying the presumption of innocence.

The jury convicted defendant of assault with force likely to produce great bodily injury and found that he had personally inflicted great bodily injury in committing the offense. The jury did not find that defendant had used a deadly weapon. He was sentenced to five years in prison. On appeal, defendant claimed the trial court abused its discretion and violated his due process rights by stationing a uniformed, armed deputy at the witness

stand during his testimony. He also asserted several points of error concerning the great bodily injury enhancement.[1] Defendant argued in a related petition for writ of habeas corpus that he was denied effective assistance of counsel by his attorney's delayed objection to the stationing of the deputy and by counsel's failure to ask the court to strike the great bodily injury enhancement.

In an opinion issued shortly before our decision in *Stevens, supra,* 47 Cal.4th 625, a divided panel of the Court of Appeal concluded the stationing of an armed deputy at the witness stand during defendant's testimony was reversible error.[2] As a result of this decision, the court did not reach issues raised in defendant's petition for writ of habeas corpus and dismissed that petition as moot.[3] Justice Haerle dissented. Although he joined the majority in criticizing the trial court's stated reasons for stationing a deputy at the witness stand, Justice Haerle urged that any lack of clarity in the record had to be interpreted in favor of a conclusion that the court had properly exercised its discretion.

We granted review to determine whether the stationing of the deputy was error and, if so, whether it was harmless.

## DISCUSSION

### I. *Courts Must Exercise Discretion in Ordering Heightened Security*

Decisions to employ security measures in the courtroom are reviewed on appeal for abuse of discretion. (*Stevens, supra,* 47 Cal.4th at p. 632; *People v. Duran* (1976) 16 Cal.3d 282, 293, fn. 12 [127 Cal.Rptr. 618, 545 P.2d 1322] (*Duran*).)

Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. (*Stevens, supra,* 47 Cal.4th at p. 643.) However, some security

---

[1] Specifically, defendant argued the court erred in failing to instruct that the enhancement had to be proven beyond a reasonable doubt and failing to recognize it had discretion to strike the enhancement. He also claimed his attorney rendered ineffective assistance by failing to request that the enhancement be stricken.

[2] The appellate court also found instructional error regarding the great bodily injury enhancement but, in light of its reversal on other grounds, did not decide whether the error was prejudicial.

[3] We declined defendant's request for judicial notice of the contents of declarations in support of his habeas corpus petition. "[W]hile courts are free to take judicial notice of the *existence* of each document in a court file, including the truth of results reached, they may not take judicial notice of the truth of hearsay statements in decisions and court files." (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882 [110 Cal.Rptr.2d 877].)

practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. (*Deck v. Missouri* (2005) 544 U.S. 622, 630 [161 L.Ed.2d 953, 125 S.Ct. 2007]; *Duran, supra,* 16 Cal.3d at pp. 290–291.) Because physical restraints carry such risks, their use is considered inherently prejudicial and must be justified by a particularized showing of manifest need. (*Duran,* at pp. 290–291; see *Deck v. Missouri,* at pp. 626–629; *Illinois v. Allen* (1970) 397 U.S. 337, 343–344 [25 L.Ed.2d 353, 90 S.Ct. 1057]; see also *Stevens,* at pp. 643–644.)

■ We recently considered whether the stationing of a uniformed deputy at the witness stand during a defendant's testimony is such an inherently prejudicial procedure that it must be subjected to heightened scrutiny. Like the Court of Appeal majority in this case, the defendant in *Stevens* characterized the deputy as a " 'human shackle' " whose presence at the witness stand improperly focused the jury's attention on his custodial status. (*Stevens, supra,* 47 Cal.4th at p. 636.) We rejected this argument and held that a security officer's presence near a testifying defendant is *not* inherently prejudicial. (*Id.* at p. 638.) We observed, "so long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings." (*Id.* at p. 639, fn. omitted.)

However, despite our conclusion that this practice is not *inherently* prejudicial, we cautioned that "the trial court must exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy." (*Stevens, supra,* 47 Cal.4th at p. 644.) We explained: "The court may not defer decisionmaking authority to law enforcement officers, but must exercise its own discretion to determine whether a given security measure is appropriate on a case-by-case basis. [Citations.] Under *Holbrook* [*v. Flynn* (1986)] 475 U.S. [560,] 570 [89 L.Ed.2d 525, 106 S.Ct. 1340], the trial court has the first responsibility of balancing the need for heightened security against the risk that additional precautions will prejudice the accused in the eyes of the jury. 'It is that judicial reconciliation of the competing interests of the person standing trial and of the state providing for the security of the community that, according to [Supreme Court precedent], provides the appropriate guarantee of fundamental fairness.' (*Lopez v. Thurmer* (7th Cir. 2009) 573 F.3d 484, 491.) The trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant. In addition, although we impose no sua sponte duty for it to do so, the court

should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the defendant's custodial status. (See, e.g., [*People v.*] Marks [(2003)] 31 Cal.4th [197,] 223 [2 Cal.Rptr.3d 252, 72 P.3d 1222].)" (*Stevens, supra,* 47 Cal.4th at p. 642.)

Here, the record demonstrates that the trial court's decision to station a deputy at the witness stand during defendant's testimony was not based on a thoughtful, case-specific consideration of the need for heightened security, or of the potential prejudice that might result. The court asserted that it had seen a deputy at the witness stand "in every trial I've ever done . . . because of security," and noted that a bailiff was "supposed" to sit behind "all defendants" who testify, "even in a petty theft" case. Despite a pointed request from defense counsel, the court refused to make an individualized finding that defendant's behavior warranted this heightened security measure. Instead, the court responded that this defendant "deserve[d]" to have a deputy stationed at the witness stand for the same basic security reasons "every defendant deserve[d]" to have this procedure employed. These remarks reveal that the court was following a general policy of stationing a courtroom officer at the witness stand during *any* criminal defendant's testimony, regardless of specific facts about the defendant or the nature of the alleged crime.

The trial court did refer briefly to some case-specific matters. It is evident from consideration of the entire record, however, that the court elevated a standard policy above these individualized concerns and based its decision on the generic policy. For example, the court mentioned that defendant was accused of inflicting a "very bad injury" and had a long rap sheet with several restraining order violations, but these brief statements were made in response to defense counsel's observations after the court had twice ruled that the deputy would remain at the witness stand. The court then refused counsel's request that it determine whether any of the restraining order incidents involved violence. The discussion as a whole reveals that the court perceived this to be a routine order, and the court's scattered references to individualized facts constituted, at most, an effort to construct a post hoc justification for a security measure the court had already decided to employ pursuant to its standard policy. While the court did characterize the order as "a discretionary call," it made clear that the deputy's placement at the witness stand was "just what happens *in every case that I've ever tried.*" (Italics added.)[4]

---

[4] The court's statement about stationing a bailiff at the witness stand "in every trial" oddly contradicts defense counsel's statement that she had never encountered the practice in the "50 or so" cases she had tried. It is remarkable that a judge and trial lawyer in the same county would report such different experiences. As we made clear in *Stevens, supra,* 47 Cal.4th at page 642, this heightened security measure should never be ordered as a routine matter.

The circumstances of the trial also indicate that the judge stationed the deputy at the witness stand as a routine practice, and not based on case-specific considerations. There was *no* discussion of the deputy following defendant to the stand before it happened. Defense counsel said the procedure took her by surprise. She had never seen it done before, and she would have objected to the deputy's presence if she had known the court intended to order it. The court did not discuss the matter with counsel, did not hear case-specific rationales for increased security, and did not state reasons on the record before imposing the security measure. All of these circumstances further support our conclusion that the court ordered the deputy's presence as a matter of routine.

 Where it is clear that a heightened security measure was ordered based on a standing practice, the order constitutes an abuse of discretion, and an appellate court will not examine the record in search of valid, case-specific reasons to support the order. Trial judges should be mindful of their duty to state the reasons for their decisions on the record. As we have explained in the context of sentencing decisions, "a requirement of articulated reasons to support a given decision serves a number of interests: it is frequently essential to meaningful review; it acts as an inherent guard against careless decisions, insuring that the judge himself analyzes the problem and recognizes the grounds for his decision; and it aids in preserving public confidence in the decision-making process by helping to persuade the parties and the public that the decision-making is careful, reasoned and equitable." (*People v. Martin* (1986) 42 Cal.3d 437, 449–450 [229 Cal.Rptr. 131, 722 P.2d 905]; see also *People v. Penoli* (1996) 46 Cal.App.4th 298, 303 [53 Cal.Rptr.2d 825].) Here, the colloquy between the court and counsel shows that the court did not base its security order on case-specific reasons because it believed stationing a deputy at the witness stand during a defendant's testimony was an acceptable routine practice. The court's reliance on this standard practice, instead of on individualized facts showing that defendant posed a safety risk or flight risk, or a risk of otherwise disrupting the proceedings, was an abuse of discretion.[5]

## II. *Harmless Error Standard of* Watson *Applies*

Having determined the court abused its discretion by stationing a deputy at the witness stand during defendant's testimony out of deference to a generic policy, we must now decide when such an error warrants reversal of the

---

[5] The court's refusal to give a cautionary instruction in this case is also troubling. In *Stevens, supra,* 47 Cal.4th at page 642, we advised trial courts to consider, upon request, instructing the jury to disregard security measures related to the defendant's custodial status. We emphasize that the trial court should give such a cautionary instruction when the defendant requests it, or should explain on the record the reasons why it has been refused.

conviction.[6] If an error violates a defendant's federal constitutional rights, reversal is required unless the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).) If the error is one of state law, we must reverse the conviction if it is reasonably probable the defendant would have obtained a more favorable result absent the error. (*Watson, supra,* 46 Cal.2d at p. 837.)

The majority below assumed the *Chapman* standard applied but did not decide the question directly.[7] The parties have directed us to no case discussing the appropriate standard of harmless error. Despite defendant's contrary position in the Court of Appeal, both sides now appear to agree that the reasoning of our opinion in *Stevens, supra,* 47 Cal.4th 625, indicates the error is appropriately reviewed under *Watson.* We agree that the error in this case is one of state law and that *Watson* governs our harmless error analysis.

The United States Supreme Court has held that the unjustified imposition of *visible physical restraints* violates a criminal defendant's right to due process under the Fifth and Fourteenth Amendments to the federal Constitution. (*Deck v. Missouri, supra,* 544 U.S. at p. 629.) In such a case, the defendant need not demonstrate actual prejudice because the high court has held that shackling is an inherently prejudicial practice. (*Id.* at p. 635; see also *Holbrook v. Flynn, supra,* 475 U.S. at p. 568.) Accordingly, when a trial court orders visible shackles without adequate justification, the People must show beyond a reasonable doubt that the error did not contribute to the verdict. (*Deck v. Missouri,* at p. 635; *Chapman, supra,* 386 U.S. at p. 24.)

█ Although the high court has held that *Chapman* furnishes the appropriate harmless error test for claims of unjustified visible shackling, it does not follow that *Chapman* should govern review of errors in imposing security procedures that are not inherently prejudicial. An inherently prejudicial procedure is one that poses such a high risk of unfairness to the defendant that its use is considered to be a violation of due process unless justified by a compelling state interest. (*Deck v. Missouri, supra,* 544 U.S. at p. 628.) Procedures recognized as inherently prejudicial typically offend the dignity of the defendant and the decorum of the court. They not only erode the presumption of innocence, but they may so distract and embarrass the

---

[6] Defendant urges us to remand the case to the Court of Appeal because that court "has not been afforded a full opportunity to consider and resolve the question of prejudice." We decline to do so because the Court of Appeal's majority closely and thoroughly examined the evidence, albeit under what we conclude was the wrong standard of review. There is no need for that court to repeat the same prejudice analysis on remand.

[7] The Court of Appeal never cited *Chapman,* but the majority reasoned that the "same standard of review" used in shackling cases should apply, and, under the facts of this case, it concluded the deputy's placement at the witness stand could not be viewed as harmless "to the certainty of the beyond a reasonable doubt standard."

defendant that they impair his ability to participate in his own defense. (*Stevens, supra*, 47 Cal.4th at pp. 632–633; see also *People v. Mar* (2002) 28 Cal.4th 1201, 1226–1228 [124 Cal.Rptr.2d 161, 52 P.3d 95]; *Duran, supra*, 16 Cal.3d at p. 288.) The United States Supreme Court has held that criminal defendants have a due process right to be free from inherently prejudicial security measures such as shackles, and the unjustified imposition of such measures is an error of constitutional dimension. (*Deck v. Missouri*, at p. 628.) However, the high court has never suggested that errors related to more benign security measures must also be subjected to heightened constitutional scrutiny. On the contrary, when a challenged practice is not "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial," the court has held that reversal is warranted only if the defendant shows "actual prejudice" resulted from the practice. (*Holbrook v. Flynn, supra*, 475 U.S. at p. 572.) This requirement that the defendant demonstrate actual prejudice is consistent with the defendant's burden under *Watson, supra*, 46 Cal.2d at page 837, to establish a reasonable probability that error affected the trial's result.

■ We recently held that the stationing of a security officer at the witness stand during an accused's testimony is not an inherently prejudicial practice. (*Stevens, supra*, 47 Cal.4th at p. 638.) We cautioned that the court must nevertheless exercise discretion and make a record of case-specific reasons for ordering this procedure; however, a court's failure to do so does not rise to the level of a constitutional violation. It is an error of state law properly reviewed under *Watson, supra*, 46 Cal.2d at page 837.

■ Here, although the trial court abused its discretion in stationing an officer at the witness stand based on a routine policy, it is not reasonably probable that defendant would have obtained a more favorable result absent the error. Defendant was monitored by a single deputy, and, as in *Stevens, supra*, 47 Cal.4th at page 639 and footnote 6, nothing in the record suggests that this deputy's demeanor was anything other than respectful and appropriate. Besides the deputy's presence, the jury had little indication that defendant was in protective custody. He wore street clothes to trial and did not enter the courtroom through a different door.

Defendant asserts the case was close because "the result necessarily depended on the jury's evaluation of the credibility of appellant versus that of Belarde." But this aspect of the case is not unique. "In nearly every case when an accused testifies in his own defense, the jury will have to weigh the credibility of the defendant and the alleged victim." (*Stevens, supra*, 47 Cal.4th at p. 641.) Although defendant now focuses on inconsistencies in Belarde's statements, he admitted some significant lies and inconsistencies during his own testimony. For example, he initially told the police Belarde

had dragged him, chased him down the street, and tried to stab him with a knife. He later admitted these were lies. Defendant also gave inconsistent accounts of how he bloodied his knuckles, first claiming the scrapes occurred in a fall, and later saying they happened when he crawled through bushes in an attempt to hide.

Finally, the evidence presented at trial strongly supports the jury's verdict. Defendant admitted that he assaulted Belarde and caused her to suffer significant injuries. Thus, the only issues for the jury concerned whether defendant acted in reasonable self-defense, i.e., that he reasonably believed he was in imminent danger of violence, reasonably believed the immediate use of force was necessary to defend himself, and used no more force than was reasonably necessary to defend against the threat. (See CALCRIM No. 3470.)

The evidence supporting defendant's self-defense claim was markedly weak. Belarde was under five feet tall. Defendant told the police she was "a little girl" and said, "she punched me, but she didn't hurt me." He also admitted that he assaulted Belarde out of anger, not fear of imminent harm, and that he used substantial force. Defendant testified that when Belarde reached toward his wallet he "got mad" and, as a result, "pushed her pretty much harder than before." When she did not leave him alone, defendant grabbed her in a headlock because he was "pretty pissed." He explained, "I was very mad. I had lost it—my temper, and I grabbed her, and just threw her on the ground." At another point, defendant said that he "just slammed her" to the ground face first. Defendant never testified that he was afraid Belarde would hurt him, or that he believed force was necessary to defend against such potential violence. Rather, he conceded that he lost his temper and used excessive force to push Belarde away. Defendant also admitted that his use of force caused Belarde to suffer "serious injuries." Indeed, in contrast to the disfiguring injuries Belarde suffered, defendant's only injuries were bleeding knuckles, which may have resulted from hitting Belarde, and a scraped forearm. Although defendant testified he did not mean to throw Belarde onto her face, or throw her down with such force, these facts do not aid his defense because assault is a general intent crime. It does not require a specific intent to injure the victim. (*People v. Williams* (2001) 26 Cal.4th 779, 788 [111 Cal.Rptr.2d 114, 29 P.3d 197]; see also *People v. Wyatt* (2010) 48 Cal.4th 776, 780 [108 Cal.Rptr.3d 259, 229 P.3d 156].) Defendant's own testimony thus defeats the claim that he acted in self-defense. Defendant's flight from the scene was also inconsistent with self-defense.

The evidence from both the prosecution and defense showed that defendant assaulted Belarde because he was angry with her, not because he believed he

was in imminent danger, and that in doing so he inflicted serious injuries.[8] Accordingly, it is not reasonably probable defendant would have obtained a more favorable result without the deputy stationed at the witness stand, and the error in this case was harmless. (*Watson, supra,* 46 Cal.2d at p. 837.)

## DISPOSITION

The judgment of the Court of Appeal is reversed, and the case is remanded for further proceedings consistent with this opinion.[9]

Cantil-Sakauye, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MORENO, J.,** Concurring and Dissenting.—I agree with the majority that the trial court erred and that the error was harmless. I disagree, however, with the harmless error test the majority employs.

In *People v. Stevens* (2009) 47 Cal.4th 625, 643 [101 Cal.Rptr.3d 14, 218 P.3d 272] (*Stevens*), this court held that a trial court's decision to have a uniformed deputy sheriff escort a defendant to the witness stand and then stay by him as he testifies is reviewed for abuse of discretion. I dissented and concluded that, under decisions of this court as well as those of the United States Supreme Court, "such an unmistakably defendant-focused security arrangement is inherently prejudicial and permissible only if the trial court first identifies an essential case-specific state interest justifying its use." (*Id.* at pp. 644–645 (dis. opn. of Moreno, J.).) A little over a year later, we find ourselves reviewing the use of a nearly identical procedure—a uniformed, armed deputy sheriff escorted defendant to the witness stand and then stood behind him as he testified. I hold to my position that such an arrangement is inherently prejudicial; I nonetheless concur in the majority's judgment that the trial court here erred, even under the less rigorous standard adopted in *Stevens.*

The majority then concludes the question of whether the error was harmless should be decided under the test articulated in *People v. Watson*

---

[8] One can also infer the jury's ability to assess this evidence fairly from the verdicts. The jury convicted defendant of assault with great bodily injury but also found he did not commit the assault with a deadly weapon, as alternatively charged. Thus, jurors did not blindly vote to convict because they perceived defendant to be dangerous. Instead, they differentiated between the two types of assault and appear to have credited defendant's testimony that he did not hit Belarde with a branch or stick.

[9] The Court of Appeal found that the trial court erred in failing to give a predeliberation instruction on the burden of proof for the great bodily injury enhancement, but it did not determine whether defendant was prejudiced by the error. This issue was not encompassed in our grant of review. On remand, the Court of Appeal should decide whether reversal is required due to the instructional error.

(1956) 46 Cal.2d 818, 837 [299 P.2d 243], that is, whether it is reasonably probable defendant would have obtained a more favorable result absent the error. Because I believe the security arrangement was inherently prejudicial, however, I would apply the more stringent standard in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (asking whether an error was harmless beyond a reasonable doubt).

Having only recently laid out the reasons why measures such as the ones employed here are inherently prejudicial (*Stevens, supra,* 47 Cal.4th at pp. 644–652 (dis. opn. of Moreno, J.)), I will not unduly belabor the point. However, a description of the measures bears brief mention.

A deputy sheriff sat behind defendant throughout the proceedings. When it came time for defendant to testify, the armed, uniformed deputy sheriff escorted defendant to the witness stand and then stood closely behind him as he testified. When defendant finished testifying, the deputy sheriff escorted defendant back to the defense table and sat back down behind defendant. When defendant testified again the next day, the arrangement was repeated. An armed, uniformed deputy sheriff did not escort any other witness.

In *Holbrook v. Flynn* (1986) 475 U.S. 560 [89 L.Ed.2d 525, 106 S.Ct. 1340] (*Holbrook*), the high court reviewed for abuse of discretion the stationing of uniformed personnel in the first row of the courtroom's spectator section. In concluding the arrangement was not inherently prejudicial (unlike the use of shackles or prison clothes), the court explained that, "[w]hile shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status." (*Id.* at p. 569.)

In *Stevens*, the majority concluded measures such as the ones used here could reasonably have been interpreted by a jury as a routine precaution or used for defendant's benefit. (*Stevens, supra,* 47 Cal.4th at pp. 640–641.) I am, to put it mildly, skeptical. When an individual, charged with assault with a deadly weapon, is escorted to the stand by an armed guard, when that armed guard stands behind him as he testifies before escorting him back to the defense table, and when no other witness is similarly escorted, I think the *only* reasonable interpretation a jury could draw from the use of this protocol

is that the trial court thinks defendant is "particularly dangerous or culpable" "suggest[ing] particular official concern or alarm." (*Holbrook, supra*, 475 U.S. at p. 569.) For that reason, I continue to believe that the use of such measures is inherently prejudicial, "poses a serious risk to the presumption of innocence and to the right to a fair trial and thus requires a trial court to first find a manifest need for using such measures." (*Stevens*, at p. 649 (dis. opn. of Moreno, J.).)

Here, of course, the trial court failed to identify *any* individualized reason for using an armed, uniformed escort, much less a manifest need. The use of such an inherently prejudicial measure "will often have negative effects, but—like 'the consequences of compelling a defendant to wear prison clothing' or of forcing him to stand trial while medicated—those effects 'cannot be shown from a trial transcript.' " (*Deck v. Missouri* (2005) 544 U.S. 622, 635 [161 L.Ed.2d 953, 125 S.Ct. 2007].) For that reason, when a court employs such a procedure "without adequate justification, . . . the defendant need not demonstrate actual prejudice to make out a due process violation." (*Ibid.*) The state must prove the error was harmless beyond a reasonable doubt. (*Ibid.*, citing *Chapman v. California, supra*, 386 U.S. at p. 24.)

I nonetheless conclude the error here was harmless even under the *Chapman* standard. Defendant's testimony essentially admitted every element of the charged offense without providing substantial evidence of any affirmative defense. On this basis, I concur in the judgment.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied April 20, 2011.