[No. E048972. Fourth Dist., Div. Two. Oct. 25, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
RAUL A. SANCHEZ, Defendant and Appellant.

COUNSEL

David L. Polsky for Defendant and Appellant.

Rod Pacheco, District Attorney, and Alan D. Tate, Deputy District Attorney, for Plaintiff and Respondent.

OPINION

**RAMIREZ, P. J.**—A jury convicted defendant, Raul A. Sanchez, of the misdemeanor of indecent exposure (Pen. Code, § 314, subd. 1), which occurred on April 6, 2008. He was sentenced to local time and appealed to the appellate department of the trial court. The appellate department, in a *per curiam* opinion, reversed defendant's conviction because it concluded, although disagreeing with it, that it was bound under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], to follow an appellate court opinion, *People v. Hernandez* which was not then final, and for which review before the California Supreme Court had subsequently been granted. The appellate department then certified the case for transfer to this court, pursuant to California Rules of Court, rules 8.1002 and 8.1005, and we granted the transfer. Then, the California Supreme Court deferred action in *Hernandez*, pending the outcome of *People v. Stevens* (2009) 47 Cal.4th 625 [101 Cal.Rptr.3d 14, 218 P.3d 272] (*Stevens*), which was subsequently decided. In light of *Stevens*, we rejected defendant's contention that his right to a fair trial was violated by the security measures used during his trial and we affirmed the judgment. Defendant then brought a petition for review before the California Supreme Court, which was granted, with further action delayed pending consideration and disposition of *People v. Hernandez* (2011) 51 Cal.4th 733 [121 Cal.Rptr.3d 103, 247 P.3d 167] (*Hernandez*). After *Hernandez* was decided, the Supreme Court transferred the case back to this court to reconsider the issue in light of the opinion in *Hernandez*. We here affirm the judgment.

FACTS

An Indio police officer testified that on March 14, 2006, at 5:52 a.m., he was dispatched to an apartment complex because a complaint had been made that a Hispanic man was running around naked. The officer encountered defendant and asked him what he was doing there, as defendant said that he lived a block away. Defendant said he was masturbating by the wall.

Concerning the charged offense, an eyewitness testified that at 2:30 a.m. on April 6, 2008, she parked her vehicle in a parking space to the right of and

about 12 feet from the front door of the convenience store of a gas station. Defendant was standing in front of her Jeep Grand Cherokee, drinking a glass of water. While her headlights were still on, defendant turned to look at her; then she turned her headlights off, but there were lights around the store. Defendant, who was leaning against the propane tank storage area, and was about four feet from the eyewitness and facing her direction, with his jacket opened, reached under his shorts and placed his hands on his penis. The eyewitness lowered the visor in her vehicle, but continued to observe defendant, who lowered his shorts to midthigh, exposing his penis, which was erect. While looking at the eyewitness more than five times interspersed between looking away from her, defendant masturbated.[1] This made her uncomfortable, nervous and afraid.[2] The eyewitness got her cell phone and called the police. Defendant continued to masturbate as she made the call. While the eyewitness was still on the phone to police, defendant stopped masturbating and left. About an hour later and across the street, she identified defendant as the person she had seen expose himself and masturbate. The eyewitness identified on the stand a picture of defendant taken at the time of his apprehension by the police as the person she had seen outside the convenience store. She identified the picture based on the jacket and shorts defendant was wearing. She also identified a photo which she testified accurately depicted the lighting conditions in the parking lot at the time.

The police officer who encountered defendant across the street from the store about an hour after the incident testified that defendant matched the description the eyewitness had provided of the man she had seen at the convenience store. Defendant was hunched down in a fetal position on the floorboard of a truck that had no license plate and was parked at a gas station that was not open at the time. Defendant did not appear to be sleeping. Defendant was not the registered owner of the truck and defendant denied owning it. A bicycle was parked in front of the truck which defendant said belonged to him and he had ridden to the area. The officer testified that the eyewitness positively identified defendant as the man she had seen at the convenience store. Defendant told the officer that he had been at the convenience store, buying cigarettes and urinating next to a tree. There was a restroom inside the convenience store which was "generally opened" and did

---

[1] However, the eyewitness told the dispatcher that defendant was not looking at her while she was talking to the dispatcher and, at that moment, she thought that defendant thought that she could not see him, although she could. The eyewitness, whose first language was not English, but who made the call to dispatch in English, explained that this inconsistency could be the result of her not being able to explain herself well in English.

The eyewitness testified that defendant did not urinate while he exposed his penis to her.

[2] However, the eyewitness told the dispatcher, when the latter asked her if she wanted to stay on the line with her after the eyewitness made her report, that she did not because she was okay and she waited there until her friends arrived to meet her.

not require a key. However, the officer did not check to see if the restroom was working at the time of the crime.

Defendant testified that he had been convicted of burglaries in 2003 and 2006. He said that on April 6, 2008, he was "living out on the street," frequently sleeping behind a market near his former home, although he continued to work. He had ridden his bike to the convenience store at the time of the crime to buy cigarettes and something to drink. He bought the cigarettes and a Mexican drink that contains rice and is, therefore, not clear in appearance. He did not recall asking the cashier if he could use the restroom inside the store and he denied using it. He left the store, urinated to the side of one of the trees outside, got his bike, which he had left behind the store, and rode off. He first noticed the eyewitness when he walked by to get his bike. He had seen only one or two people, who were at the gas pumps, when he had made his purchases in the store and urinated outside. He had noticed a vehicle parked about where the eyewitness had parked her vehicle while he was urinating, but he did not remember the eyewitness looking over at him. He got into the truck across the street at the closed gas station; he thought was abandoned, knowing he did not have the owner's permission to enter it, in order to sleep. However, he did not fall asleep. Thirty to 40 minutes later, the officer arrived and defendant showed him his purchases and told him that he was in the truck trying to get some rest or sleep. When the officer asked defendant if he had exposed his genitals, defendant said that he did not that he knew of but he had urinated by the palm tree at the convenience store. However, on cross-examination, defendant admitted that he had exposed his penis in order to urinate. Defendant admitted masturbating outside an apartment complex on March 14, 2006. Defendant also admitted masturbating in an alley in the past and telling police officers on November 22, 2005, that he had done so, although, when first approached by them, defendant said he had been urinating.

The jury was instructed that it could consider the fact that defendant had been convicted of burglaries in evaluating his credibility. The jury was told that if it concluded by a preponderance of the evidence that defendant indecently exposed himself previously, it could conclude from this that defendant was disposed or inclined to commit sexual offenses and based on that, also conclude that defendant was likely to commit the charged indecent exposure. Finally, as is pertinent here, the jury was instructed that the People had to prove beyond a reasonable doubt that he willfully exposed his penis in the presence of another person who might be offended or annoyed by this and when he did so, he acted lewdly by intending to direct public attention to his penis for the purpose of sexually arousing or gratifying himself or another or sexually offending another.

Defense counsel argued to the jury that defendant was urinating. He relied on the eyewitness's statement to the dispatcher that, at that time of the call,

defendant was not looking at her and he thought that she was not looking at him[3] as undermining a finding of intent to sexually arouse or gratify himself or to sexually offend her.

## Issue And Discussion

According to the record before us, at trial, a deputy followed defendant as he walked from his chair at the counsel table to the witness stand. The deputy then variously stood or sat behind defendant, near the jury box, while defendant testified, being sure not to block the jury's view of defendant. The deputy stood "at ease"; his gun remained holstered and he did not have his hand on his belt. When defendant finished testifying, the deputy followed him back to his seat at the counsel table. Although not specifically mentioned by the trial court, defendant was in custody throughout trial and was dressed in civilian clothes for it.

Defense counsel said nothing before defendant began to testify or during his testimony, but after he left the stand, counsel moved for a mistrial on the basis that the deputy's activities deprived him of a fair trial. The trial court denied his motion, saying, "The deputy's obligation is to escort the witness to the witness stand when we have a defendant, for the safety of the public and the Court, and the deputy is going to stand somewhere in the general vicinity of the defendant, and the jury knows he's the defendant in a criminal case. I'm sure they can conclude why we have a deputy in the courtroom to begin with. [¶] I don't think it's any more prejudicial to have a deputy here at all than to have him stand over by the jury box, and from my observations, the deputy was quite relatively unintrusive. He was standing relaxed. He didn't have his gun drawn. He didn't have his hand on his belt . . . . He was simply standing there in an appropriate fashion and making sure the courtroom was orderly and safe."

■ In *Stevens*, the California Supreme Court held that "the stationing of a courtroom deputy[4] next to a testifying defendant is not an inherently prejudicial practice that must be justified by a showing of manifest need. . . . [¶] . . . [¶] . . . [A] 'trial court has broad power to maintain courtroom security and orderly proceedings. [Citations.]' [Citation.] For this reason, decisions regarding security measures in the courtroom are generally reviewed for abuse of discretion. [Citations.] [¶] . . . [¶] . . . [V]isible physical restraints must survive heightened scrutiny and be justified by a particular need. . . . [¶] But the stringent showing required for physical restraints like shackles is the exception, not the rule. Security measures that are not

---

[3] See footnote 1, *ante*, at page 74.

[4] The California Supreme Court did not determine whether this deputy wore a firearm. (*Stevens, supra*, 47 Cal.4th at p. 631, fn. 1.)

inherently prejudicial need not be justified by a demonstration of extraordinary need. . . . [¶] In [*People v.*] *Duran* [(1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322]], we specifically distinguished shackling from the use of armed guards in the courtroom. [Citation.] We explained that unless the guards 'are present in unreasonable numbers, such presence need not be justified by the court or the prosecutor. [Citations.]' [Citation.] California courts have long maintained this distinction between the presence of security officers and the imposition of physical restraints. . . . [¶] . . . [In *Holbrook v. Flynn* (1986) 475 U.S. 560 [89 L.Ed.2d 525, 106 S.Ct. 1340] (*Holbrook*), the United States Supreme Court said,] 'The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. . . . Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [Citation.]' . . . [¶] Indisputably, events in recent years have resulted in security guards becoming even more ubiquitous than when [*Holbrook* was decided]. . . . [T]he presence of security guards in the courtroom 'is seen by jurors as ordinary and expected.' . . . [¶] . . . [¶] . . . Although a deputy's presence next to a testifying defendant may be viewed as a defendant-focused practice when officers do not accompany other witnesses to the stand, the [United States] Supreme Court has made it clear that not 'every practice tending to single out the accused from everyone else in the courtroom must be struck down.' [Citation.] . . . That a security practice seems to focus attention on the defendant is not enough, without more, to render the practice inherently prejudicial. [¶] . . . The United States Supreme Court has previously approved the posting of uniformed, armed troopers immediately behind defendants sitting at counsel table. [Citation.] This accepted practice is not transformed into an inherently prejudicial measure simply because an officer rises with the defendant and maintains the same proximity to him while he testifies. . . . The presence of a deputy does not directly impair the accused's mobility, nor does it create an affront to human dignity that we have lamented in the context of visible shackles. [Citations.] . . . [S]o long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to permit a deputy's presence near

the defendant at the witness stand is consistent with the decorum of court-room proceedings. [¶] . . . [¶] . . . Further, the jury was properly instructed to disregard the fact that defendant was in custody. [¶] . . . [¶] Although we conclude that a heightened showing of manifest need is not required to justify the stationing of a security officer near the witness stand, the responsibility of the trial court remains the same. The court may not defer decisionmaking authority to law enforcement officers, but must exercise its own discretion to determine whether a given security measure is appropriate on a case-by-case basis. [Citations.] Under *Holbrook, supra,* 475 U.S. at page 570, the trial court has the first responsibility of balancing the need for heightened security against the risk that additional precautions will prejudice the accused in the eyes of the jury. . . . [Citation.] The trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant. In addition, although we impose no sua sponte duty for it to do so, the court should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the defendant's custodial status. [Citation.]" (*Stevens, supra,* 47 Cal.4th 625, 629–642, fns. omitted.)

In *Stevens,* in response to defense counsel's objection to the "policy" of having a deputy sit with the defendant while the latter testified, the trial court observed that a deputy had been sitting behind the defendant throughout trial, and having a deputy in the same proximity to the defendant as he testified would not be more prejudicial. (*Stevens, supra,* 47 Cal.4th at p. 632.) The trial court further concluded that the sheriff's department policy of having a deputy at the stand when an in-custody defendant testifies for safety purposes or to prevent escape was not unreasonable. (*Ibid.*) Further, the court said it did not want jurors distracted by safety concerns. (*Ibid.*) One juror had submitted a note about the defendant's agitated behavior and irritability, saying it was distracting, but had not made him afraid of the defendant, and the prosecutor noted that the defendant had become agitated in the presence of another deputy. (*Ibid.*)

The Supreme Court concluded, "[T]he trial court came to its own conclusion about the stationing of the deputy and did not abdicate control to law enforcement. . . . [T]he trial court mentioned a sheriff's department 'policy . . . .' However, the court's full response [to defendant's objection] indicates it was not blindly adhering to a law enforcement decision. The court observed that it considered the precaution to be 'reasonable,' and noted that 'jurors are much more concerned about their own safety . . . anyway.' The court went on to explain why it believed the presence of a deputy . . . would actually benefit defendant [by freeing the jurors from being distracted by safety concerns so they could concentrate on defendant's testimony]. . . . This

observation is particularly apt in light of the two juror notes . . . remarking on defendant's demeanor. In addition, the trial court observed defendant would not be prejudiced . . . because a deputy had been seated behind defendant throughout the trial, and '[h]aving the deputy in . . . the same proximity, . . . will be no more prejudicial than it has been to that point.' " (*Stevens, supra,* 47 Cal.4th at pp. 642–643.)

Relying on the above quoted language in *Stevens,* in *Hernandez,* the California Supreme Court concluded that the trial court's decision to place a deputy at the witness stand during the defendant's testimony "was not based on a thoughtful, case-specific consideration of the need for heightened security, or of the potential prejudice that might result. The court asserted that it had seen a deputy at the witness stand 'in every trial I've ever done . . . because of security,' and noted that a bailiff was 'supposed' to sit behind 'all defendants' who testify, 'even in a petty theft' case. Despite a pointed request from defense counsel, the court refused to make an individualized finding that defendant's behavior warranted this heightened security measure. Instead, the court responded that this defendant 'deserve[d]' to have a deputy stationed at the witness stand for the same basic security reasons 'every defendant deserve[d]' to have this procedure employed. These remarks reveal that the court was following a general policy of stationing a courtroom officer at the witness stand during *any* criminal defendant's testimony, regardless of specific facts about the defendant or the nature of the alleged crime. [¶] . . . [T]he [trial] court elevated a standard policy above these individualized concerns and based its decision on the generic policy. . . . The discussion as a whole reveals that the court perceived this to be a routine order, and the court's scattered references to individualized facts constituted, at most, an effort to construct a post hoc justification for a security measure the court had already decided to employ pursuant to its standard policy. While the court did characterize the order as 'a discretionary call,' it made clear that the deputy's placement at the witness stand was 'just what happens *in every case that I've ever tried.*' . . ." (*Hernandez, supra,* 51 Cal.4th at p. 743, fn. omitted.)

The explanation of the trial court here lies somewhere between what happened in *Stevens* and what happened in *Hernandez,* in that the trial court did not voice any case-specific concerns, yet commented that the deputy's presence near defendant while he testified was no more prejudicial than his presence near him at the counsel table. However, we will err on the side of caution and presume that the trial court abused its discretion under *Hernandez.*

*Hernandez* held that such error is reviewed under the *Watson* standard. (*People v. Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243]; see *Hernandez, supra,* 51 Cal.4th at p. 746.) We conclude that it is not reasonably probable

that defendant would have obtained a more favorable result absent the presence of the deputy near defendant while he testified. As observed in *Hernandez*, "[N]othing in the record suggests that this deputy's demeanor was anything other than respectful and appropriate. . . . [Defendant] wore street clothes to trial . . . ." (*Hernandez*, at p. 746.) Moreover, as in *Hernandez*, the case was not close on the facts. The eyewitness's testimony was very strong. The propensity evidence was admitted by defendant, as were his felony offenses, which the jury could have utilized to determine that his testimony was not worthy of belief. His version of events was further undermined by its lack of persuasive appeal especially considering he had used the same "defense" for an earlier identical incident.

#### DISPOSITION

The judgment is affirmed.

McKinster, J., and King, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 1, 2012, S198427.