Filed 1/7/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B301093 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA465222) |
| v. | |
| ERNEST JIM CHOI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Leslie A. Swain, Judge. Affirmed in part and remanded with directions.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After representing himself at trial, Ernest Choi was convicted of three counts of stalking (Pen. Code, § 646.9, subd. (a))[1] and two counts of criminal threats (§ 422). He was sentenced to seven years, which included two one-year prior prison enhancements pursuant to section 667.5, subdivision (b). He appeals the judgment, arguing (1) the evidence was insufficient to sustain the criminal threats counts; (2) the trial court abused its discretion and denied his right to present a defense by excluding a defense witness; and (3) the court abused its discretion by applying a blanket practice of denying requests for advisory counsel because, in the court's words, "That's not the way it's done in this courthouse."

We find sufficient evidence underlies the criminal threats counts, the trial court properly excluded one witness, and that, despite the court's initial statement, the record reflects it *did* exercise its discretion to deny Choi's request for advisory counsel based upon the characteristics of this defendant and this case.

We remand for the trial court to strike Choi's two one-year enhancements pursuant to Senate Bill No. 136 (SB 136) and resentence him. We will also order a correction to the criminal conviction assessment in the abstract of judgment. In all other respects, we affirm.

## BACKGROUND

*Prosecution Case*

In 2017, Choi was a paralegal student at Los Angeles City College (LACC). Victims Kareem Williams and Leslie Castillo, as well as Carolyn Delgado, were also students in the program. The four formed a study group and socialized outside of class.

---

[1]     Undesignated statutory citations refer to the Penal Code.

They frequently texted and emailed each other in group messages. In the fall of 2017, victim Andrianna Martirosyan joined the paralegal program and became friends with Choi and the others. She worked as a legal assistant in the Los Angeles County District Attorney's Office.

While they were friends, Williams went to Choi's apartment several times. During one visit, Choi mentioned there were military guns in his brother's bedroom, although Williams never saw them.[2] Choi's brother did indeed own several firearms, including an AR-15, but he did not keep them in the apartment. He told Choi about them.

A month or two before final exams scheduled for December 16, 2017, Choi missed class for two weeks. When he returned, his behavior changed. He mentioned his criminal history and tried to show his study group documents related to his criminal record. He told Martirosyan to stay away from Williams, Delgado, and Castillo because they were "not good people." According to Delgado, in November 2017, Choi's behavior became erratic: he started missing classes and would "say like gibberish stuff" in phone calls and in text messages.

In the days leading up to final exams, Choi sent several strange texts to Castillo. A December 12 text said, "For you maybe I got 99, but you ain't one." Castillo understood this to refer to a song with the lyric "having 99 problems . . . 'but a bitch

---

[2] Williams admitted at trial that he incorrectly told a detective he saw guns in Choi's apartment. Williams explained he was "frazzled" and "loopy" during that interview due to Choi's later actions, as we will describe them. Williams said he was losing sleep and watching his door to ensure Choi "wasn't coming."

ain't one.' " Choi said in a text on December 14, "But things change and now you're a hundredth." Castillo texted him that she didn't need distractions, and he responded, "Okay, nigger."[3] She responded that he needed to relax and he was "beginning to scare" her. Choi later texted her, "Hey Les, for the record, I'll break you like Jason Derulo. Play with me at your own risk," with the word "you" in all capital letters, "and read it out loud loudly." To Castillo, this felt like a threat. She responded, "Are you threatening me? Because this is not a joke." She also texted him, "How about you just leave me alone like I asked you to?"

According to Williams, Choi did not sit with him in class on December 13 and bobbed his head up and down. Two days later on December 15, Choi called Williams mumbling, giggling, and speaking rapidly. Williams thought Choi was "on some sort of substance."

Also on December 15, Martirosyan woke up from a nap to find three missed calls and a voicemail from Choi. On the voicemail, Choi said her full name very slowly in a "creepy different tone." Martirosyan called him back. On the call, he was mumbling, slurring, and screaming at her; he "couldn't put a sentence together." She thought he was stressed about finals and might harm himself. During the call, he said he knew she worked for the District Attorney's Office and she knew his history, which she thought was an accusation that she looked up his criminal background. He told her she "looked good." He also said, "I'm a naughty boy. I'm evil," and repeated four or five times, "I don't want to snap. I don't want to cause harm to

---

[3]     Although Castillo is Hispanic, she interpreted Choi's text as an insult.

4

anyone." Martirosyan was scared. She interpreted his comments to mean LACC was in danger, given they had final exams the next day. She called the LACC campus Sheriff's department and contacted LACC professor Wilhelm Vargas to alert them to her safety concerns about Choi.

Final exams were held on December 16. Around 8:30 a.m., Martirosyan told Williams about the prior day's phone call from Choi. She was scared. Williams revealed he had received a similar call and was also scared. That morning, Professor Vargas saw an email from Martirosyan alerting him to her safety concerns, so he met with Williams, Martirosyan, and another student. He called Choi and told him not to come to school that day.

Distressed, Choi called Delgado as she was driving to LACC to take final exams. He told her Professor Vargas told him not to come for final exams that day. He thought Delgado had "snitched" on him and told Professor Vargas his behavior was unacceptable. He said, "I need to end. I need to end Kareem and Leslie," referring to Williams and Castillo. Then he repeated the word "end" three times. Scared, she asked what he meant, and he said, "I didn't mean it that way." Still, Delgado interpreted it as a threat. Choi did not tell her to relay his comments to Williams or Castillo.

Nonetheless, Delgado called Castillo and told her about her conversation with Choi. Delgado said he seemed crazy and said he was going to "end" her and Williams. Castillo was scared and interpreted the comment as a threat. At school, Castillo and Delgado told Professor Vargas about Choi's "very weird call" and said they were afraid.

Around 9:30 a.m., Choi called Williams to say he wasn't coming to school, and he asked Williams to give two Scantron forms to another student, Patrick Seaton. Choi then sent a text to Castillo and Delgado saying he had been instructed not to come to class. Choi later texted Castillo saying that Williams and Martirosyan said something about him and he would be expelled.

After finishing the first final exam that day, Delgado told Williams about Choi's comment on the call with her that he would "end" Williams. Williams was scared and "freaked out," believing Choi would "shoot up the school" because Choi had previously mentioned his brother had guns and Choi had some sort of special military training. Martirosyan overheard this conversation. Williams had previously told Castillo he had seen guns in Choi's apartment, so Castillo believed Choi could carry out his threats.

At 1:27 p.m. on exam day, Choi texted Williams, "Just know we can fade this at my place," which Williams interpreted as a challenge to a fist fight.

Also at some point that day, a text from Choi was forwarded to Martirosyan stating: "Now you're responsible for Andrianna [Martirosyan] because you took my prison prior . . . info told in confidence, to look me up at the D.A. office, why? She doesn't have the authority to be looking into my data. Only official police business . . . . That's grounds for termination . . . . Not fired. Terminated." Martirosyan was worried Choi would kill her.

Choi never showed up for exams at LACC on December 16.

Choi's erratic behavior continued. On December 17, he texted Williams the word "Exterm87." Williams believed it

6

meant "Exterminate 187," a reference to the criminal law final exam they took a few days earlier involving Penal Code section 187, the statute prohibiting murder. Castillo received a similar text saying "Exterminate" and "T87," which she interpreted as a threat.

On January 10, 2018, Choi sent Martirosyan text messages with photographs of an axe and stated, "FYI: from now on no more bullshit. You want respect, give first. That's a principle" and "Seethe if I'm joking." A friend forwarded images of the axe to Castillo.

A search of Choi's apartment did not uncover any guns, but law enforcement found the axe depicted in Choi's photographs. A forensic search of Choi's phone revealed an internet search for "confirm kill count" on December 15, 2017, the day before final exams.

Evidence was introduced that Choi pled no contest to stalking another person, Christine Yoon, in 2015. Yoon testified to the circumstances surrounding Choi's similar conduct at that time. In January 2018, Choi sent Yoon strange text messages, including a photograph of an axe.

*Defense Evidence*

A deputy testified he received a complaint about a possible shooter on the LACC campus, so he stood outside the classroom to ensure Choi did not show up.

Choi was suspended from LACC on December 20, 2017 due to his behavior. He was on probation at the time of the incidents in this case, and he was prohibited from accessing firearms.

During the proceedings in Choi's 2015 stalking case, his mother shook Yoon's hand in the courthouse. On the day Choi

7

pled no contest, Yoon called Choi's mother and said, "Miss Choi, I'm so sorry."

The trial court precluded Choi from calling Patrick Seaton as a defense witness, but the parties stipulated that he would testify Choi was in a study group with Seaton and another student, in addition to his group with Delgado, Castillo, and Williams. The parties also stipulated that Martirosyan accessed Choi's prior stalking case in 2015 in the regular course of her duties at the District Attorney's Office.

## DISCUSSION

## I. Sufficient Evidence Supported Choi's Criminal Threats Convictions

Williams and Castillo were named as victims in the two criminal threats counts. The prosecution based the counts on Choi's statement in his December 16 phone call to Delgado, "I need to end Kareem and Leslie," i.e., Williams and Castillo. Choi contends insufficient evidence demonstrated his comment was a criminal threat in violation of section 422. We disagree.

Because Choi has not raised any free speech arguments, we review his contention for substantial evidence. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 804 (*Wilson*).) " 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citation.]' " (*Id*. at p. 805.)

To show a criminal threat pursuant to section 422, the prosecution must prove " '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"— was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T.* (2004) 33 Cal.4th 620, 630.)[4]

---

[4]    Section 422 provides in relevant part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (§ 422, subd. (a).)

Choi contends his comment, "I need to end Kareem and Leslie," was too "facially ambiguous" to constitute a criminal threat. Not so. True, when Delgado questioned him about what he meant, he told her, "I didn't mean it that way." But the jury could have rejected his apparent equivocation and found his comment was an unambiguous threat to harm Williams and Castillo. " '[T]he nature of the threat cannot be determined only at face value. Section 422 demands that the purported threat be examined "on its face and under the circumstances in which it was made." The surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat,' and such threats must be 'judged in their context.' " (*Wilson, supra,* 186 Cal.App.4th at p. 807.) Thus, "[a] communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning." (*In re George T., supra,* 33 Cal.4th at p. 635.)

First and perhaps most important, the three members of Choi's close-knit study group didn't think Choi's comment was ambiguous. They saw it as a threat. Delgado, who spoke directly with Choi, thought his statement was a threat to Castillo and Williams, despite Choi's comment that he "didn't mean it that way." She was concerned enough to call Castillo right away. Castillo became scared and believed the comment was a threat. When Williams heard about Choi's comment, he "freaked out," believing Choi would "shoot up the school" because Choi had previously mentioned his brother had guns and Choi had some sort of special military training.

Second, Choi's threat fell into a pattern of threats and disturbing comments before and after his phone call with

10

Delgado. Two days before the call, he sent a series of texts to Castillo saying she essentially became his "hundredth" problem; he called her the n-word; and he said he would "break" her and she would "play with me at your own risk." She asked him if he was threatening her and told him to leave her alone. Several hours after he made the threat on the call with Delgado, he challenged Williams to "fade" at Choi's apartment, which Williams understood to be a challenge to a fistfight. The day after the call to Delgado, Choi sent a text to Williams with the word "Exterm87" and sent a similar text to Castillo with the words "Exterminate" and "T87." Both Williams and Castillo interpreted those messages as threats. Then a month later in January 2018, Choi sent a photograph of an axe that was forwarded to Castillo. When viewed within Choi's pattern of erratic and threatening behavior, a jury could readily conclude Choi's statement that he "need[ed] to end" Williams and Castillo was an unambiguous threat of harm.

Choi next argues it was not clear that he wanted his threat to be relayed to Williams and Castillo. A defendant may be convicted of a criminal threat made to a third party so long as "he specifically intended that the threat be conveyed to the victim." (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861; see *People v. Felix* (2001) 92 Cal.App.4th 905, 913 (*Felix*); *In re David L.* (1991) 234 Cal.App.3d 1655, 1659 (*David L.*).) In *David L.*, for example, sufficient evidence showed a minor intended a criminal threat to be conveyed to the victim when he made the threat to the victim's friend and it "followed a series of hostile encounters between the minor and the victim culminating in a fight at school," which the friend had witnessed. (*David L., supra,* at p. 1660.)

As in *David L.*, the evidence here supported an inference Choi intended Delgado to convey his threat to Williams and Castillo. By all accounts, Choi, Delgado, Williams, and Castillo were a close-knit group, taking the same classes, studying together, and hanging out socially. They frequently texted and emailed each other as a group. Choi made his threat on the call with Delgado as she was driving to LACC to sit for final exams they were all taking, so he undoubtedly knew she would see Williams and Castillo when she arrived at school. The threat came two days after he sent disturbing messages to Castillo and only hours before he challenged Williams to a fight. The day after the call, he texted Williams and Castillo messages alluding to extermination and the Penal Code section for murder. All of this suggests the group had open lines of communication and Choi was not shy about using them to contact the others with his disturbing messages. The jury could have reasonably inferred he called Delgado the morning of finals so she would share his threat with Williams and Castillo.

Choi relies on *Felix*, but it is readily distinguishable. The defendant in that case conveyed his threats to his jail therapist "while discussing highly personal thoughts about homicide, suicide, and his emotions for [the victim]. He made them in a setting where the patient has an expectation of confidentiality." (*Felix, supra,* 92 Cal.App.4th at p. 914.) The court distinguished *David L.* because, unlike the friendship between the victim and friend in that case, there was no evidence to show the defendant knew the therapist would convey the threat to the victim. (*Felix, supra,* at p. 913.) As in *David L.* and unlike in *Felix*, the close connection among Choi, Delgado, Williams, and Castillo could give rise to a reasonable inference

12

that Choi called Delgado the morning of final exams intending that she communicate his threat to Williams and Castillo, whom she would see shortly.

Choi's last argument is not entirely clear, but he seems to suggest the evidence showed his threat was not imminent because he said he was not coming to school on the day of finals. A threat need only convey " ' "a gravity of purpose and an immediate *prospect* of execution of the threat." ' " (*Wilson, supra,* 186 Cal.App.4th at p. 807, italics added.) "[I]t 'does not require an immediate ability to carry out the threat.' " (*Ibid.*) The fact that Choi phrased his threat as a compulsion—the "need" to "end" Williams and Castillo—strongly suggested Choi intended to execute the threat imminently. Even if he did not intend to go to school the morning of finals on December 16, the jury could have reasonably concluded the prospect of fulfilling the threat was sufficiently immediate to satisfy the statute.

Choi relies on *In re A.C.* (2019) 37 Cal.App.5th 262, but it contains a crucial factual distinction. In that case, the minor did not want to go to school because he was being bullied. He told his counselor if he went to school and got teased, " 'he was going to react' " and " 'basically stab them with whatever he had available.' " (*Id.* at p. 265.) Here, by contrast, Choi's threat was not conditioned on him being *forced* to go to LACC. Instead, he was told to *stay away* on the day of finals, which distressed him. He had a recent history of erratic and disturbing behavior. Williams, Castillo, and Martirosyan were all scared, suggesting they believed he would show up at LACC, despite his claims to the contrary. Williams even thought he would "shoot up the school." The jury could have discounted Choi's comments that he

13

was not coming to LACC and concluded there was an imminent prospect that he would execute his threat.

Sufficient evidence supported the criminal threats counts.

## II.  The Court Acted Within Its Discretion in Excluding Defense Witness Seaton

Choi contends the trial court abused its discretion and violated his constitutional rights to present a defense when it denied his request to call Patrick Seaton, a fellow student. We review the exclusion of evidence for abuse of discretion. (*People v. Martinez* (1998) 62 Cal.App.4th 1454, 1459.)  We find none.

Before trial, Choi expressed his intention to call Patrick Seaton as a defense witness.  The court noted if Choi called Seaton to testify about conversations he had with Choi, that testimony would be hearsay.  Choi disagreed.  He explained Seaton would testify about Choi "contacting Kareem Williams on the morning of the test which he has completely omitted in his statements."  Choi intended to undermine Williams's testimony that he believed Choi would come shoot up the school on the day of finals "[b]ecause I was supposed to give Patrick [Seaton] two Scantrons that morning so he can take his two finals.  I wasn't able to take my finals that morning, so I called Kareem and asked him basically can you give Patrick two scans for me? Kareem gave Patrick two Scantrons and these are all through text communications.  [¶]  Now, later on after I told Kareem that I can't make it to school because, you know, somebody told on me, Kareem said, 'Oh, I think Ernest is going to come to school with a gun and shoot us all.'  Now, why would he say that when I told him directly—."  The court said Choi could call Williams on that

14

point.  The court tentatively allowed Choi to call Seaton on a different topic.

During trial, Choi renewed his request to call Seaton to testify that Choi called and texted him the morning of finals to let him know Williams would provide the Scantrons to him.  The court noted, "I think none of that is in dispute."  The court excluded Seaton because "[h]e has nothing relevant to say."  Choi objected that the court was violating his "Sixth Amendment right to call witnesses . . . in my defense."[5]

On appeal, Choi contends the trial court should have allowed Seaton to testify as a "relatively objective third party, one whose testimony would corroborate a basic and important point about appellant's intentions on the morning of December 16 at roughly the same time period when [Choi] was supposed to be 'threatening' Williams and Castillo by speaking with Carolyn Delgado."  He emphasizes that Martirosyan testified that, in conflict with Williams' testimony and Seaton's proposed testimony, Williams told her Choi *was* "going to show up to school and to make sure there's a Scantron waiting for you."  He argues this "raised questions" about Choi's intentions that day.

The trial court acted well within its discretion in excluding Seaton's testimony.  There was no *genuine* dispute at trial that Choi called Williams on the morning of finals to instruct him to give Seaton two Scantrons.  Williams admitted on both direct and cross examination that Choi had called him on the day of finals to say he wasn't coming to school, and he asked Williams to give two

---

[5]    In the trial court, Choi identified other topics that Seaton's testimony would cover, but Choi does not raise those topics on appeal.

15

Scantron forms to Seaton. There was also other testimony that Choi wasn't coming to school that day. Professor Vargas testified he told Choi not to come to school, and Choi told Delgado in his phone call and told Castillo and Delgado in text messages that he had been instructed not to come to class.

While Martirosyan recalled that Williams told her Choi was actually coming to school to pick up a Scantron, the record makes clear her testimony was not offered for the truth of what Williams said. The prosecution objected to this line of questioning as not relevant unless it was "being offered for potential effect on the witness's state of mind," to which Choi responded, "Yes." Thus, no genuine conflicted existed in the evidence, and Seaton's testimony would have added little to this record.

Choi's derivative constitutional argument fails because " 'the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal] right to present a defense.' " (*People v. Robinson* (2005) 37 Cal.4th 592, 626–627.)

### III. Despite Its Reference to a Blanket Practice, the Trial Court Properly Exercised Its Discretion to Deny Advisory Counsel

As noted, Choi represented himself in the trial court. Before trial, he filed a written motion requesting to use either his own advisory counsel or be appointed advisory counsel. The court denied the motion, explaining: "Mr. Choi, I've indicated to you from the very beginning and I'm sure the court who took your counsel waiver also informed you that you would not be entitled to co-counsel. *That's not the way it's done in this courthouse.* I know I still have the authority to appoint counsel in your case, but I'm going to deny that request. I believe that you have made

a choice to represent yourself.  You are, obviously, a very, very intelligent man and you can work with a lawyer and help that lawyer get ready for trial, assist that lawyer, but it doesn't go the other way around."  (Italics added.)

Choi clarified he was asking for "advisory" counsel, not co-counsel.  The court responded, "I treat those two as the same." Choi contended advisory counsel was "a little bit different" because advisory counsel "is just to manage technical questions about the technical procedures of trial when what I need to ask and I wouldn't be given."  The court reminded him of the rights he waived to represent himself and required him to "do it on your own.  Many people do it and you're smarter than most, so you'll just have to become familiar with the rules or give up your pro per status and assist an attorney who knows what he or she is doing."

Choi contends the court impermissibly applied a blanket rule to deny his request for advisory counsel as demonstrated by the court's comment, "That's not the way it's done in this courthouse."  The trial court has discretion to appoint advisory counsel.  (*People v. Crandell* (1988) 46 Cal.3d 833, 861 (*Crandell*), overruled on another ground by *People v. Crayton* (2002) 28 Cal.4th 346, 364–365.)  Factors for the court to consider include the defendant's education, familiarity with the criminal justice system, and demonstrated legal abilities; the defendant's reasons for seeking advisory counsel, including evidence of a manipulative purpose; the seriousness of the charges; and the complexity of the issues.  (*People v. Debouver* (2016) 1 Cal.App.5th 972, 976 (*Debouver*).)  We review the decision for abuse of discretion and will only set it aside if it is "arbitrary, capricious, or whimsical."  (*Ibid.*)

17

A court *necessarily* abuses its discretion when it fails to exercise its discretion at all, however. (*People v. Bigelow* (1984) 37 Cal.3d 731, 743 (*Bigelow*); see *Crandell, supra,* 46 Cal.3d at p. 861.) "A discretion which can be exercised in one way only, or which is shackled by rigid rules regarding its exercise, is no discretion at all." (*Crandell, supra,* at p. 863.) Both *Crandell* and *Bigelow* involved erroneous blanket denials of advisory counsel without the exercise of discretion. In *Bigelow*, the trial court incorrectly believed California law did not permit appointment of advisory counsel. (*Bigelow, supra,* at pp. 742–743.) In *Crandell*, the trial court believed "there is no such thing" as advisory counsel and stated it "wouldn't appoint that kind of counsel anyway." (*Crandell, supra,* at p. 862.) This was error because "[n]one of the judges who considered the matter expressly acknowledged the existence of discretion to appoint advisory counsel for defendant, and there is no evidence that any judge engaged in a reasoned exercise of judgment based on an examination of the particular circumstances of this case." (*Ibid.*)

We agree with Choi that *if* the trial court's comment demonstrated it was following a blanket practice or policy to deny advisory counsel in all cases, such a standardized approach would be erroneous. As *Bigelow* and *Crandell* made clear, the appointment of advisory counsel is a discretionary choice that must be guided based on the individualized circumstances of each case and each defendant. The court's comment here that advisory counsel was unavailable to Choi because "[t]hat's not the way it's done in this courthouse" falls within the same category as the trial court's misunderstanding of California law in *Bigelow* and the trial court's comments in *Crandell* that there was "no such thing" as advisory counsel and it "wouldn't appoint that

kind of counsel anyway."  Trial courts may neither create nor implement such blanket policies or practices to deny advisory counsel.

That said, unlike in *Bigelow* and *Crandell,* the record in this case demonstrates the court did not apply the blanket practice to deny advisory counsel, even if it improperly suggested such a practice existed.  The court here stated on the record, "I know I still have the authority to appoint counsel in your case," thereby "expressly acknowledg[ing] the existence of discretion to appoint advisory counsel for" Choi.  (*Crandell, supra,* 46 Cal.3d at p. 862; see *Debouver, supra,* 1 Cal.App.5th at p. 976 ["The trial court ruled that it was not required to appoint advisory counsel but acknowledged that courts may do so.  This is not a case in which the trial court failed to exercise its discretion or believed there is no such thing as advisory counsel," citing *Crandell* and *Bigelow*].)  The court also "engaged in a reasoned exercise of judgment based on an examination of the particular circumstances" of Choi's case.  (*Crandell, supra,* at p. 862.)  It noted Choi "made a choice to represent" himself, he was "obviously, a very, very intelligent man," and he could help a lawyer prepare for trial.  While the court also noted the assistance "doesn't go the other way around," again in context the court was simply referring to the individualized circumstances of Choi's case.  The court went on to remind him of the rights he waived when he chose to represent himself, again noting he was "smarter than most."  And of course, the trial court was aware the entire case arose while Choi was enrolled in a paralegal program at LACC.

At oral argument, Choi's counsel analogized this case to *People v. Hernandez* (2011) 51 Cal.4th 733 (*Hernandez*), but it is

19

distinguishable.  In that case, the California Supreme Court held the trial court's comments on the record made clear it was improperly applying a practice of requiring a deputy to stand behind every defendant who testified, rather than exercising discretion to assess the need for such heightened security on a case-by-case basis.  (*Id.* at p. 736.)

As the court explained:  "Here, the record demonstrates the trial court's decision to station a deputy at the witness stand during defendant's testimony was not based on a thoughtful, case-specific consideration of the need for heightened security, or of the potential prejudice that might result.  The court asserted that it had seen a deputy at the witness stand 'in every trial I've ever done . . . because of security,' and noted that a bailiff was 'supposed' to sit behind 'all defendants' who testify, 'even in a petty theft' case.  Despite a pointed request from defense counsel, the court refused to make an individualized finding that defendant's behavior warranted this heightened security measure.  Instead, the court responded that this defendant 'deserve[d]' to have this procedure employed.  These remarks reveal that the court was following a general policy of stationing a courtroom officer at the witness stand during *any* criminal defendant's testimony, regardless of specific facts about the defendant or the nature of the alleged crime."  (*Hernandez, supra,* 51 Cal.4th at p. 743.)

Choi's counsel correctly pointed out the trial court in *Hernandez* also mentioned some case specific characteristics of the defendant and our high court concluded that did not change the blanket nature of the denial.  "The trial court did refer briefly to some case-specific matters.  It is evident from consideration of the entire record, however, that the court elevated a standard

policy above these individualized concerns and based its decision on the generic policy. . . . The discussion as a whole reveals that the court perceived this to be a routine order, and the court's scattered references to individualized facts constituted, at most, an effort to construct a post hoc justification for a security measure the court had already decided to employ pursuant to a standard policy. While the court did characterize the order as 'a discretionary call,' it made clear that the deputy's placement at the witness stand was 'just what happens *in every case that I've ever tried.*'" (*Hernandez, supra,* 51 Cal.4th at p. 743.)

Other circumstances in the case also pointed to a "routine practice" of stationing a deputy at the witness stand. "There was *no* discussion of the deputy following defendant to the stand before it happened. Defense counsel said the procedure took her by surprise. She had never seen it done before, and she would have objected to the deputy's presence if she had known the court intended to order it. The court did not discuss the matter with counsel, did not hear case-specific rationales for increased security, and did not state reasons on the record before imposing the security measure. All of these circumstances further support our conclusion that the court ordered the deputy's presence as a matter of routine." (*Hernandez, supra,* 51 Cal.4th at p. 744.)

None of the circumstances from *Hernandez* are present in this case. Instead, the record here points to the opposite conclusion. While our high court in *Hernandez* held the trial court applied a blanket policy despite some references to case-specific facts, here the trial court relied on Choi's specific abilities and characteristics to deny advisory counsel despite its passing comment, "That's not the way it's done in this courthouse." Viewed in the context of this record, we are satisfied the court did

21

not apply a blanket practice of denying advisory counsel without exercising its discretion under the circumstances. Choi does not argue the trial court abused its discretion when it evaluated the individualized characteristics of his case. We find no error warranting reversal.

## IV. The Prior Prison Terms Must Be Stricken and Choi Must Be Resentenced

Effective January 1, 2020, SB 136 amended section 667.5, subdivision (b) to eliminate the one-year prior prison term enhancement unless the prior term was served for a sexually violent offense. (Stats. 2019, ch. 590, § 1; see *People v. Winn* (2020) 44 Cal.App.5th 859, 872 (*Winn*); *People v. Lopez* (2019) 42 Cal.App.5th 337, 340–342 (*Lopez*).) This new law applies to nonfinal judgments pending on appeal. (*Winn, supra,* at p. 872.) Choi's prior prison terms for stalking no longer qualify for the enhancements and his case is still pending, so the two prior prison term enhancements must be stricken.

Without providing any explanation, Choi says in his briefing that he "wishes to waive any challenge to the[se] enhancements." However, because SB 136 applies retroactively to his sentence and he no longer qualifies for the enhancements under section 667.5, his sentence is unauthorized. An unauthorized sentence may be corrected at any time. (See *People v. Nasalga* (1996) 12 Cal.4th 784, 789, fn. 4 [pl. opn. of Werdeger, J.].)

Respondent argues we should remand for the trial court to strike the enhancements and conduct a full resentencing. We agree. The court did not impose the maximum sentence. (Cf. *Winn, supra,* 44 Cal.App.5th at pp. 872–873 [no remand for resentencing because trial court imposed maximum sentence];

*Lopez, supra,* 42 Cal.App.5th at p. 342 [same].) The court made various discretionary sentencing choices to structure Choi's seven-year sentence as follows: a base term of five years consisting of the mid-term of three years for the stalking count involving Martirosyan plus two years for the two prison priors; one-year consecutive term (one-third of the mid-term) for the stalking count involving Williams; one-year consecutive term (one-third of the mid-term) for the stalking count involving Castillo. The court stayed punishment on the two criminal threats counts.

In the absence of the two one-year prior prison term enhancements, the court may reevaluate its sentencing decisions in light of the changed circumstances. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' "].) Remand for resentencing is appropriate.

V.    **The $30 Criminal Conviction Assessment Must Be Corrected in the Abstract of Judgment**

Respondent points out the sentencing minute order and abstract of judgment correctly included a $200 court operations assessment pursuant to section 1465.8 but incorrectly included a $30 fee for the criminal conviction assessment pursuant to Government Code section 70373. The correct criminal conviction assessment is $150, or $30 *per conviction* for Choi's five convictions. (*People v. Lopez* (2010) 188 Cal.App.4th 474, 480.) When the trial court issues a new abstract of judgment following resentencing, the fees must be corrected accordingly.

## DISPOSITION

Choi's sentence is remanded with directions to strike the two one-year enhancements pursuant to section 667.5, subdivision (b) and conduct a full resentencing. The court is directed to ensure the correct fees of $200 (§ 1465.8) and $150 (Gov. Code, § 70373) are reflected in the new abstract of judgment issued following resentencing.

In all other respects, the judgment is affirmed.

**CERTIFIED FOR PUBLICATION**


BIGELOW, P. J.


We Concur:


GRIMES, J.


STRATTON, J.

24