Filed 12/7/22  P. v. Maneewong CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094737 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE012101) |
| v. | |
| KHAM MANEEWONG, | |
| Defendant and Appellant. | |

On August 2, 2020, during a clash that erupted in front of a local market, defendant Kham "Peter" Maneewong's partner, codefendant Pailynn "Mina" Lansing, stabbed defendant's sister V.M. in the stomach.  Defendant stabbed V.M. in the back three times.  Defendant was holding his 15-month-old daughter at the time.  Defendant then charged at another sister, N.M., with his knife.  A jury found defendant guilty of two counts of assault with a deadly weapon and one count of felony child endangerment, and the jury found true the allegation that, in the assault of V.M., defendant personally inflicted great bodily injury.  The trial court sentenced defendant to an aggregate term of 11 years in prison.

1

On appeal, defendant asserts (1) the prosecution failed to meet its burden of proving the absence of self-defense or defense of others beyond a reasonable doubt and the jury's verdicts on counts one and three were not supported by substantial evidence, (2) he was denied the effective assistance of counsel based on his attorney's failure to request certain bracketed language in the self-defense jury instruction, (3) the matter must be remanded for resentencing based on changes made to Penal Code section 654,[1] and, in supplemental briefing, that (4) the matter must be remanded based on recent changes to section 1170.[2]

We conclude the prosecution satisfied its burden of disproving self-defense and defense of others beyond a reasonable doubt and that substantial evidence supports the jury's verdicts. Even if counsel was ineffective for failing to request the bracketed language for the jury instruction on self-defense, defendant was not prejudiced as a result. Finding merit to defendant's contentions concerning sections 654 and 1170, we will remand for resentencing. Otherwise, we affirm defendant's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

An information charged defendant in count one with assault with a deadly weapon (§ 245, subd. (a)(1); victim V.M.), in count two with assault with a deadly weapon (§ 245, subd. (a)(1); victim N.M.), and in count three with felony child endangerment (§ 273a, subd. (a)). Lansing was charged in counts one and three. The information

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    Defendant asserts these changes were enacted by Assembly Bill No. 124 (2021-2022 Reg. Sess.). However, Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) was enacted after Assembly Bill No. 124 and incorporated Assembly Bill No. 124's amendments to section 1170. (Stats. 2021, ch. 731, § 3(c).) Senate Bill No. 567 takes precedence because it was enacted last. (Gov. Code, § 9605.) We address defendant's claims as raised under Senate Bill No. 567.

further alleged that, in the commission of count one, defendants personally inflicted great bodily injury on V.M. within the meaning of section 12022.7, subdivision (a). It was further alleged defendant had a sustained petition in juvenile court for a crime that constituted a serious felony within the meaning of section 1192.7, subdivision (c), and that he thus came within the provisions of section 667, subdivisions (b)-(i).

### *The Prosecution's Case*

V.M. and N.M. were defendant's sisters and the sisters lived with their mother. The house was directly across the street from a local market. On August 2, 2020, defendant, Lansing, who was his girlfriend, and defendant's three daughters came over to his mother's house.[3] V.M.'s mother went outside when defendant and his family arrived. However, V.M. did not talk to defendant because she did not have a good relationship with him. Nor did V.M. talk to Lansing because they "don't talk." V.M. estimated she had only seen Lansing four times prior to trial.

Around the same time, N.M. was walking to her mother's house with J.C., her niece. They ran into defendant and his two teenage daughters who, by this time, were in front of the market across the street. J.C. asked defendant if they were having any problem or if she did something to upset him because he had been ignoring her. According to J.C., defendant pulled out a knife, flicked it open, and started screaming. J.C. was shocked. She and defendant argued.

From her mother's house, V.M. heard shouting or arguing. She was still inside her mother's house when she heard the screaming. V.M. and her son went outside and V.M.

---

[3]    Defendant testified he and Lansing were married through "Laos tradition" but not "in American custom."

Two of defendant's daughters were teenagers and were from a prior relationship. The youngest, defendant and Lansing's daughter, was 15 months old.

saw Lansing in front of the house, holding a baby in her arms. Defendant was across the street. V.M. heard defendant and J.C. screaming. Lansing, still holding the baby, crossed the street towards the market and V.M. followed "right behind her."

According to J.C., Lansing already had a knife in her hand as she approached the market. As Lansing approached, J.C. screamed at Lansing to "put the baby down." J.C. was concerned for the child's safety because Lansing had a knife. J.C. was not trying to start a fight with Lansing.

Lansing handed the baby to defendant. Everyone "was screaming and yelling." Lansing then turned around and tried to hit V.M. as V.M. stood against the wall. V.M. moved back and felt only a "little nick" or a brush against her chin. V.M. testified she had not touched Lansing at all before Lansing swung at her and that she did not see anyone else touch Lansing either. She also did not shout at Lansing, call her any names, or threaten her.

V.M. grabbed Lansing and tried to hold her and then she and Lansing were swinging at each other. They were "just battling." At this time, they were both up against the wall. J.C. tried to break up the fight.

N.M. saw Lansing stab V.M. in the stomach. J.C. testified Lansing stabbed V.M. "in the front," but she subsequently testified she "did not see who stabbed her in the front." However, she did see Lansing's knife covered in blood.

Defendant came up behind V.M. so V.M. was between Lansing and defendant. N.M. and J.C. both saw defendant stab V.M. in the back. J.C. saw defendant stab V.M. twice in the back. Defendant was still holding his baby when he stabbed V.M.

According to J.C., after stabbing V.M., Lansing was "hopping around, asking . . . , Who wants it? Who wants it?" and "Who wants it next?"

V.M. did not realize she had been stabbed until she heard someone say she had been. V.M.'s son pulled her away. V.M. then noticed defendant and Lansing each had a knife.

V.M.'s son became upset and said, "You stabbed my mom." Defendant came towards V.M.'s son pointing his knife at him. V.M. shielded her son to protect him. She then started to panic as she saw that blood was "pouring out." Defendant's mother arrived and calmed defendant down. However, defendant then walked towards N.M. pointing his knife at her. N.M. backed up and threatened to hit defendant with her water bottle. Defendant's mother continued to try to calm him down.

During the entire incident, V.M. never saw anyone hit or touch defendant. V.M., N.M., and J.C. each testified they did not have weapons and they did not see anyone else with weapons other than defendant and Lansing. N.M. did not pull Lansing's hair or punch her, and she did not see anyone try to hit defendant. V.M. never hit Lansing and did not pull her hair. J.C. did not see V.M. punch or attack Lansing. Rather, Lansing instigated the fight. J.C. never saw anyone try to hit defendant or Lansing.

The prosecution played People's exhibit 4, a video recording of the skirmish in front of the market recorded on a video camera at defendant's mother's home.[4] V.M. identified Lansing in the video carrying a child and herself following behind Lansing. J.C. testified that, in the events occurring five seconds into the video, she saw that Lansing had a knife. V.M. testified that Lansing could be seen throwing a punch in the video. V.M. again testified she never touched Lansing or pulled her hair before Lansing threw a punch at her, and no one else did either. The prosecution also played People's exhibit 3, a video recording from another camera at defendant's mother's house. This video shows the events at a greater distance or less zoomed in, and with a more obstructed view, but this video includes sound.

---

[4]     Defense exhibit A was also played at trial. It is a zoomed-in version of People's exhibit 4.

At some point, J.C. called 911.  Arriving at the scene, Officer Katie Rappazzo located Lansing approximately 20 feet from the market returning to the scene.  She had a folding pocketknife.  The knife appeared to have been recently wiped down, but there was still wet blood on it.  Lansing also had a case of four throwing knives in her purse.  The throwing knives did not have blood on them.  Rappazzo testified Lansing had a little bruise and a small scratch on her bicep and a faint bruise on her right forearm.  Defendant had very small scratches on either side of his neck.  Rappazzo did not observe injuries to defendant's or Lansing's faces.

Officer Corey Stackhouse approached defendant at the market and defendant, unprompted, put his hands in the air.  Defendant had a beer bottle in one hand and a folding knife in the other.  Defendant said, "I stabbed her."  This statement is memorialized in body camera footage, People's exhibit 50, discussed further *post*.  Eventually, Stackhouse noticed defendant's blade appeared as though blood may have been wiped from it, but some blood remained and appeared to still be wet.

EMT's treated V.M. and took her to the hospital.  She had four stab wounds.  She had wounds to her upper stomach, on her "left lower butt," on the lower left side of her back, and underneath her shoulder blade.  People's exhibits 28 and 29 were photographs that showed the stab wound to her stomach.  Lansing inflicted that wound.  People's exhibits 30, 31, 32, and 33 showed a stab wound to V.M.'s back.  Defendant inflicted this wound.  Another wound to her back was visible in People's exhibits 33 and 34.  Defendant also inflicted that wound.  People's exhibit 35 showed one of the wounds to her back as well as a wound below her buttocks.  Defendant inflicted that wound as well.

Officer Lucas Copp took a statement from V.M. at the hospital.  She was fairly coherent at the time.  Unlike her trial testimony, in which she testified she was inside the house immediately after defendant's arrival, V.M. told Copp she had been on the front porch.  V.M. could not hear the conversation between defendant and her mother, so she sat and watched.  At some point, an argument escalated near the market.  V.M. saw

6

Lansing move towards her niece, so V.M. grabbed Lansing because she did not want Lansing to hurt her niece. Lansing started hitting her. V.M. told Copp she did not realize she had been stabbed until someone told her. V.M. told Copp she had not had any physical altercation with defendant. However, Copp did not ask her if defendant had stabbed her.

### Evidence Presented by Lansing

Lansing testified she was with the baby and defendant's mother when defendant and his two older daughters walked to the market. At some point, she heard yelling. Defendant's mother told Lansing to go across the street. Lansing, carrying the baby and a soda can, went across the street. She had a knife clipped onto her hip because it was "a bad neighborhood." V.M. followed right behind her.

Lansing arrived in front of the market where people were yelling. J.C. was there, and she started yelling at Lansing, "Put the baby down." J.C. called her "[b]itch," "[w]hore," and "[s]lut." N.M. was screaming at everybody. Lansing handed the baby to defendant. Lansing testified that, at this point, she did not have a knife in her hand. The next thing Lansing remembered was being grabbed. She turned around and punched V.M., who had grabbed her. Lansing testified that V.M., J.C., and K.C., who was J.C.'s sister, pushed her against a wall. She testified she was "surrounded." V.M. and J.C. both pulled Lansing's hair and hit her on the head, and K.C. held onto her right side.

Lansing managed to get her hand free, grabbed her pocketknife, and flipped it open. Lansing "was just stabbing trying to get people away from me." At some point, she realized she had stabbed V.M. Then, everyone moved away from her.

Lansing walked away to compose herself, but then circled back. She did not clean her knife. When she returned to the market, she gave officers the knife.

Lansing testified the throwing knives in her purse belonged to defendant. She did not get them out that day. In her culture, throwing knives keep bad spirits away.

Lansing testified there had been prior acts of violence between her and defendant's sisters. These events occurred when defendant still lived at his mother's house. In April 2018, N.M. followed Lansing and defendant as they went to the market. At the market, N.M. screamed at Lansing, placed her hands around Lansing's neck, and squeezed. Defendant made her stop. Defendant immediately decided to move out of his mother's house. As he was loading the car, Lansing was in defendant's room and N.M., V.M., and another sister jumped her. One sister took Lansing to the ground and N.M. and V.M. kicked Lansing. Again, defendant stopped the attack. Lansing did not fight back during this incident.

Officer Mark Haynes interviewed K.C. She told him she saw V.M. push Lansing against a wall. That is when Lansing pulled out a knife. K.C. saw Lansing stab V.M. K.C. told Haynes that defendant did not stab V.M. and that he had not been close enough to V.M. to stab her.

In her trial testimony, K.C. stated that, when she arrived at the scene, she encountered V.M. hunched over and she saw blood on the ground. Lansing had a knife. K.C. remembered Lansing saying, "Who wants it, who wants it." Additionally, she saw defendant lunging at N.M. with a knife. She did not see anyone else with a weapon. K.C. testified she did not tell Officer Haynes that V.M. pushed Lansing against a wall. She acknowledged telling officers that defendant did not stab V.M. She testified, "[t]hat's what I thought I had seen . . . ." K.C. testified she was not present for the argument and was not involved in the altercation at all.

### Evidence Presented by Defendant

Defendant did not like his sisters. He had not spoken with them for four to five years. Defendant testified that, other than his mother, no one in his family liked Lansing.

On August 2, 2020, defendant called his mother and they agreed he would come over. When they arrived, defendant called his mother and told her he was outside. Defendant's two older daughters were thirsty, so defendant took them to the market.

8

Lansing and the youngest daughter stayed behind and played with defendant's mother in the front yard. At the time, defendant had a knife clipped onto his pocket. He testified he used it for fishing.

At the market, defendant was confronted by J.C., who was being aggressive, and N.M. J.C. asked him if there was a problem between them. Defendant said, loudly, he did not "want to deal with this right now."

Defendant then noticed Lansing walking towards the market holding the baby and a soda can. V.M. was right behind her. J.C. dashed towards Lansing and yelled, "Put the baby down, bitch. Put the baby down, 'ho." Defendant grabbed the baby.

A scuffle broke out between Lansing and V.M. V.M. pulled Lansing's hair and, with her other hand, hit Lansing on the shoulder. Lansing was surrounded by defendant's sisters, and they had Lansing and defendant pinned against the wall. Defendant moved away and grabbed his knife. He warned everyone to get away and flicked the knife open. Suddenly, defendant was involved in the scuffle. He testified he "probably hit her. I'm not sure." He testified that, if he stabbed V.M., he did not mean to. He did not know when he stabbed V.M. or where he stabbed her. He testified he had to defend himself, his baby, and Lansing. He emphasized they were outnumbered and people were punching and scratching him.

Eventually, everyone separated. Defendant's mother came over and calmed him down. Then N.M. started yelling and coming towards him and he charged towards her intending to keep her away. At another point, V.M.'s son was yelling at defendant, and defendant walked towards him, although he did not think that he had his knife in his hand at that point.

Defendant then went into the market, bought a beer, and drank it. He realized he must have stabbed V.M. because there was blood on his knife. He waited at the scene until police arrived. On cross-examination, defendant testified that, when police arrived,

he admitted he stabbed V.M. not because he recalled doing so, but because there was blood on his knife.

Defendant testified Lansing had a knife because his mother lives "in a bad neighborhood." He also testified the throwing knives in Lansing's purse were his and he had them because, when he went fishing, he would practice throwing them at trees.

Defendant acknowledged he did not see V.M., N.M., or J.C. with a weapon. Only defendant and Lansing had knives.

During cross-examination, the prosecution played People's exhibit 50, a body camera video recorded as an officer approached defendant at the market. As the officer approached, defendant stated "I'm th[e] one that stabbed her." He repeated, "I stab her." When an officer reported to another officer that "he said he stabbed her," defendant stated, "Yeah, I admit, I admit."

Defendant testified he stabbed V.M. "[a]ccidentally." Asked if he "accidentally put your knife into her back three times," defendant responded that he did. However, reversing course, he subsequently testified, "Okay. I stabbed. It's not an accident." He purposely stabbed V.M. three times. He knew he did it on purpose. However, on recross-examination, he again changed course, testifying he did not mean to stab V.M. He "[u]npurposely" and "accidentally" stabbed her. He testified he did not intend to testify earlier that he stabbed V.M. on purpose.

### Verdict and Sentencing

The jury found defendant guilty on all three counts and found true the allegation that, in connection with count one, he personally inflicted great bodily injury on V.M. The jury found Lansing not guilty of assault with a deadly weapon on V.M. but guilty of the lesser included offense of assault. The jury further found her not guilty of felony child endangerment but guilty of the lesser included offense of misdemeanor child endangerment.

10

At a bench trial, the trial court found true the allegation defendant sustained a prior strike and the court denied defendant's motion to strike the prior strike. (See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.) The court sentenced defendant to an aggregate term of 11 years, consisting of the midterm of three years on count one, doubled for his prior strike, plus an additional three-year term for the section 12022.7, subdivision (a) great bodily injury enhancement, and two years, one-third the midterm doubled, on count two. The court imposed four years on count three, the low term of two years doubled, and stayed execution of that sentence pursuant to former section 654.[5]

DISCUSSION

I

*Self-defense/Defense of Others and the Sufficiency of the Evidence*

Defendant asserts the prosecution failed to meet its burden of proving the absence of self-defense beyond a reasonable doubt and that the jury's verdicts on counts one and three were not supported by sufficient evidence. Defendant asserts the evidence created a reasonable doubt as to whether he acted in self-defense and/or in defense of Lansing. He emphasizes inconsistencies in prosecution witness testimony and their statements to law enforcement. He also relies heavily on the video evidence, asserting that it "irrefutably shows that the prosecution witnesses repeatedly lied on the stand."

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to

---

[5]      Defendant correctly points out that, on the abstract of judgment, the amounts the court imposed for the court operations assessment (§ 1465.8) and the conviction assessment (Gov. Code, § 70373) are reversed. We need not order this error corrected as we are remanding for resentencing.

11

determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

The evidence establishes, and defendant does not dispute, that, during the scuffle, defendant stabbed V.M. in the back three times. When law enforcement approached defendant at the scene, defendant stated, "I'm th[e] one that stabbed her" and "I stab her." When one officer reported to another that defendant "said he stabbed her," defendant stated, "Yeah, I admit, I admit." The evidence further establishes defendant was holding his 15-month-old at the time, and that he later charged at N.M. with his knife. We turn to whether the prosecution proved the absence of self-defense and/or defense of others beyond a reasonable doubt.

"In California we impose only the most minimal burden upon a defendant with respect to excuse or justification. All that is required is that there be some evidence supportive of excuse or justification or that the defendant in some manner inform the court that he is relying upon such a defense. In such a case the jury must be instructed on the defense and the prosecution bears the burden of disproving it beyond a reasonable doubt." (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1158-1159.) Because defendant testified he was acting in defense of himself, Lansing, or his daughter, the prosecution had the burden to prove beyond a reasonable doubt he did not act in self-defense or

12

defense of others. (*People v. Morales* (2021) 69 Cal.App.5th 978, 988.) However, as stated, our review is for substantial evidence. (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 212.)

" 'To justify an act of self-defense for [an assault charge under Penal Code section 245], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064 (*Minifie*).) " 'In other words, the defendant's belief must both subjectively exist and be objectively reasonable.' " (*People v. Cruz-Partida, supra*, 79 Cal.App.5th at p. 212.) "The threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances.' " (*Minifie*, at pp. 1064-1065.) "Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083.) "It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' " (*Id*. at p. 1083.) "Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found" himself. (*Ibid*.) A defendant must use "no more force than was reasonably necessary to defend against the threat." (*People v. Hernandez* (2011) 51 Cal.4th 733, 747 (*Hernandez*), citing CALCRIM No. 3470.)

We conclude the prosecution proved the absence of self-defense and/or defense of others beyond a reasonable doubt. Ultimately, we need not explore at length the extent to which the evidence established defendant had " 'an honest *and reasonable* belief that bodily injury [was] about to be inflicted on him' " or his family. (*Minifie, supra*, 13 Cal.4th at p. 1064.) This is because we conclude the prosecution established, beyond a reasonable doubt, that defendant used far greater force "than was reasonably necessary to defend against the threat." (*Hernandez, supra*, 51 Cal.4th at p. 747.) Any " 'right of

13

self-defense is limited to the use of such force as is reasonable under the circumstances.' " (*Minifie*, at p. 1065.)

According to J.C., Lansing had her knife out as she approached the location where defendant and J.C. were arguing. J.C. yelled at Lansing to put the baby down because of the obvious danger to the child's safety. Lansing handed the baby off to defendant, V.M. approached Lansing, and the scuffle erupted immediately. According to V.M., Lansing swung at her unprovoked, and they began to struggle with each other. Lansing stabbed V.M. in the stomach. Defendant, holding his 15-month-old daughter, came up behind V.M. and stabbed her in the back three times. Lansing, with her knife, then asked, "Who wants it?" and "Who wants it next?" Moments later, defendant walked towards N.M. pointing his knife at her.

Uncontradicted evidence established V.M., N.M., and J.C. were unarmed. Only defendant and Lansing were armed. They each had a knife, as well as the four throwing knives in reserve in Lansing's purse. By V.M.'s, N.M.'s, and J.C.'s accounts, no one attacked or punched defendant or Lansing or pulled Lansing's hair, at least before Lansing attacked V.M. According to the prosecution evidence, Lansing instigated the fight.

Thus, defendant stabbed his unarmed sister V.M. three times in the back after Lansing, also armed with a knife, attacked her. Defendant then charged at another unarmed sister with his knife. When approached by law enforcement, defendant admitted unsolicited that he stabbed V.M.; he did not say he acted in self-defense or in defense of anyone else.

Defendant claims it is "irrelevant" that no one had any weapons other than defendant and Lansing. According to defendant, the "sheer number of people" involved "was enough to deem reasonable the reaction elicited from the defendants." We cannot agree it is irrelevant that no one but defendant and Lansing were armed. Indeed, in discussing the verdicts returned for Lansing, which we address *post*, defendant

14

acknowledges that, generally, an assault with fists "does not justify the use of a deadly weapon in self-defense." (*People v. Enriquez* (1977) 19 Cal.3d 221, 228, disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.) This undercuts defendant's position. Additionally, to the extent they are even perceptible in photographs, People's exhibits 37 to 46, and to the extent they in fact resulted from the skirmish, the very minor nature of any injuries to defendant and Lansing further undermines the notion that defendant was faced with a threat that justified the use of deadly force.

In contrast to the evidence presented by the prosecution, Lansing testified that she did not have her knife out when she approached the market. According to Lansing, V.M. grabbed her and she turned around and punched V.M. Three much larger women then had Lansing surrounded, pulling her hair and hitting her on the head.[6] Lansing stabbed V.M. Lansing also testified about defendant's sisters' alleged attack on her in 2018.

Defendant testified V.M. pulled Lansing's hair and hit Lansing on the shoulder. Defendant testified both he and Lansing were surrounded. He testified that he then "probably hit her," although he also testified that he did not know when he stabbed V.M. or where he stabbed her. Defendant testified that, later, N.M. started yelling and coming towards him and he charged towards her intending to keep her away.

The evidence presented by the prosecution and that presented by defendant and Lansing portrayed conflicting accounts of the events. This gave rise to a question of credibility. However, in reviewing the record to determine whether it discloses sufficient evidence, we "neither reweigh the evidence nor reevaluate the credibility of witnesses.

---

[6] V.M. was five feet five inches tall and weighed 221 pounds. N.M. was five feet four and weighed 210 pounds. According to defendant, V.M., N.M., and J.C. were "quite a bit bigger" than Lansing.

15

[Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings, supra*, 50 Cal.4th at pp. 638-639.) The jury plainly resolved credibility issues in favor of the prosecution.

Even assuming Lansing and defendant were surrounded as they claimed, they were surrounded by unarmed family members and they were both armed with knives. Additionally, inasmuch as either Lansing or defendant could claim to be surrounded, so could V.M., who, at least for some time, was boxed in by defendant on one side, Lansing on another, and a wall on a third side. This comports with the stab wounds to her stomach, inflicted by Lansing, and to her back, inflicted by defendant.

Here, whatever threat defendant, Lansing, and his daughter did face, the evidence established, beyond a reasonable doubt, that defendant's response in stabbing his unarmed sister in the back three times was force far greater than that reasonably necessary to defend against the threat. (*Hernandez, supra*, 51 Cal.4th at p. 747.) The prosecution proved, beyond a reasonable doubt, defendant's use of force was not reasonable under the circumstances (*Minifie, supra*, 13 Cal.4th at pp. 1064-1065), and substantial evidence supported the jury's verdicts.

Defendant raises a number of issues based on the video recordings, asserting they furnished objective evidence demonstrating prosecution witnesses "repeatedly lied on the stand." He asserts that, because "vacillating, incomplete, and unreliable story telling created the bases for the convictions," and because the video recordings "support the defense's version of the events, the prosecution failed to prove the absence of justification beyond a reasonable doubt." We have independently reviewed the video recordings in our consideration of this appeal.

Defendant asserts the videos demonstrate that, contrary to her trial testimony, J.C. was "extremely angry when she first confronted" him. Defendant also claims the videos demonstrate J.C. was "verbally assaultive" and she was screaming at Lansing to put the baby down because "she was about to beat the lights out of the much smaller" Lansing, and she "wanted to be able to beat [Lansing] without having to consider" the baby. The video recordings demonstrate that, as the encounter began, J.C. walked fairly quickly toward Lansing as Lansing approached the market. Defendant walked in the same direction as J.C., beside her but under the market's overhanging roof. J.C. can be seen gesturing or pointing in Lansing's direction. Additionally, on People's exhibit 3, after Lansing crossed the street holding the baby, a voice can be heard yelling, twice, "Put the baby down!" J.C.'s purpose in making these statements is not clear from the video recordings. She testified she made these statements out of concern for the safety of the baby. It appears that she also made other statements, but those, which were not in English, were not translated at trial. Based on our review of this evidence, we do not conclude that the jury was bound to determine J.C. was "extremely angry," "verbally assaultive," and, crucially, wanted to beat Lansing and posed a threat to defendant, Lansing, or the baby justifying the use of deadly force.

Defendant claims that the video recording showing Lansing holding the baby and a soda can in one hand and opening the gate with the other hand before crossing the street "completely quashes [J.C.'s] claim that [Lansing] came armed with a knife in her hand and ready to fight, and that [J.C.] was screaming 'Put the baby down' because [J.C.] was worried about the baby." We are not persuaded. Based upon our review of the video, it is entirely possible Lansing pulled out her knife before she reached the location of the market near J.C. As she crossed the street and approached the site of the altercation, Lansing's back was to the video camera and, after she was more than halfway across the street, it cannot be discerned what was in her hand, if anything. Moreover, as Lansing crossed the street, a banner notification obscured a portion of the screen, including

17

Lansing, for several seconds. After the banner disappeared, it cannot be discerned what, if anything, Lansing was holding in her right hand, which cannot be seen in the recording. Of course, in reviewing a claim for sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution. (*Jennings, supra*, 50 Cal.4th at p. 638.) The video recording by no means precludes a determination that Lansing had a knife in her hand as she arrived among the group in front of the market. And, of course, in reviewing the record to consider the sufficiency of the evidence, we "presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*Id.* at pp. 638-639.)

Defendant also asserts the video evidence irrefutably establishes that V.M. "jerked [Lansing] backwards" as J.C. approached Lansing from the front. We should state here that the video recording focused on the front of the market, People's exhibit 4, is not sharp or of high quality. In any event, based on our review, while it does appear Lansing moved suddenly and quickly immediately before she turned and took a big swing at V.M., it is not clear that V.M. jerked Lansing backwards as defendant contends. Based on the video, we simply do not know what happened immediately before Lansing swung at V.M.

Defendant asserts the video recordings establish that J.C. was too far from Lansing to see if she was holding a "small knife" at the relevant times. Having viewed the video recordings, we simply do not agree with defendant's assertion in this regard.

In addition to emphasizing the video evidence, defendant also emphasizes the jury's verdict finding Lansing not guilty of the greater charge of assault with a deadly weapon against V.M. notwithstanding the fact that the evidence indicated Lansing inflicted V.M.'s stomach wound. Defendant asserts this demonstrates that the jury found Lansing was justified in stabbing V.M. Defendant asserts this evidence gave rise to a reasonable doubt as to whether *he* was justified in stabbing V.M. because he faced the same imminent danger as did Lansing. In other words, defendant *assumes* the jury

18

concluded Lansing acted with justification, and then asserts that, based on the same facts, he must have as well. According to defendant, it "does not make sense . . . that while [Lansing] was justified in stabbing [V.M.], [defendant] was not, as both [defendant] and [Lansing] were trying to prevent the same imminent danger." While acknowledging that, ordinarily, an assault with fists will not justify use of a deadly weapon in self-defense (*People v. Enriquez, supra*, 19 Cal.3d at p. 228), defendant asserts "a reasonable jury could not have found beyond a reasonable doubt that 'the nature of the attack did not justify the resort to deadly force' " by defendant " 'or that the force used [(three stabs)] exceeded that which was reasonably necessary to repel the attack', because the same jury found [Lansing] not guilty of assault with a deadly weapon."

Defendant's contention is without merit. Had the jury found that the prosecution failed to satisfy its burden of proving, beyond a reasonable doubt, that Lansing did not act in lawful self-defense or defense of another, it should have acquitted her on count one, not found her guilty of the lesser included offense of simple assault. (See CALCRIM No. 3470; cf. *People v. Elmore* (2014) 59 Cal.4th 121, 133-134 [reasonable self-defense is a complete justification for a killing and, if believed, such a killing is not a crime].) In any event, we cannot know why the jury chose to acquit Lansing of assault with a deadly weapon and convict her of the lesser included offense of simple assault. Nevertheless, even if we were to find some inconsistency between Lansing's verdict and defendant's, "[t]he law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence." (*People v. Palmer* (2001) 24 Cal.4th 856, 860.) Whatever the basis for the Lansing verdict, it does not constitute grounds to reverse defendant's convictions.

The prosecution proved the absence of self-defense or defense of others beyond a reasonable doubt. Substantial evidence supports the jury's verdicts.

19

## II

### *Ineffective Assistance of Counsel*

At the jury instruction conference, the trial court stated it intended to instruct the jury with CALCRIM No. 3470 on self-defense. Defendant's attorney did not object, stated she was satisfied with the jury instruction packet, and expressly stated she had no requests for additions. The trial court instructed the jury with CALCRIM No. 3470 as proposed.

Defendant asserts he received the constitutionally ineffective assistance of counsel based on his trial attorney's failure to seek certain instructions on self-defense. Specifically, defendant faults his attorney for failing to request the bracketed instructions for CALCRIM No. 3470 which state: "[If you find that _____ *<insert name of victim>* threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]" and "[If you find that the defendant knew that _____ *<insert name of victim>* had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]" (CALCRIM No. 3470 [bracketed instructions].) Defendant asserts that "the only logical explanation for [Lansing's] acquittal and [defendant's] guilty verdict" on counts one and three "is that here the jury was not properly instructed on how to use the prior attack on [Lansing] when deciding its verdicts for" defendant.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court

20

need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland*, at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Ibid*.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient.[7] (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.)

Here, even if defendant's trial attorney was ineffective for failing to request the bracketed instructions based on Lansing's testimony that defendant's sisters attacked her in 2018, defendant cannot establish prejudice. We have concluded, *ante*, that the prosecution proved the absence of self-defense or defense of others beyond a reasonable doubt, and that substantial evidence supported the jury's verdicts. Our conclusion is predicated on the fact that the evidence established, beyond a reasonable doubt, that defendant used far greater force "than was reasonably necessary to defend against the threat" (*Hernandez, supra*, 51 Cal.4th at p. 747), and that his use of force was not " 'reasonable under the circumstances' " (*Minifie, supra*, 13 Cal.4th at p. 1065).

The bracketed instructions would have instructed the jurors that, in deciding whether defendant's conduct and beliefs were reasonable, they were permitted to consider whether defendant's sisters threatened or harmed defendant or Lansing in the past, and whether defendant knew that they had threatened or harmed others in the past. (CALCRIM No. 3470 [bracketed instructions].) These instructions could have had no

---

[7] Defendant relies on *People v. Howard* (1987) 190 Cal.App.3d 41, 48, which states that, "[i]n statistical terms, . . . *Strickland* requires a significant but something-less-than-50 percent likelihood of a more favorable verdict." In the intervening 35 years, no published case has explicitly cited or followed *Howard* for this numerical, quantitative approach. Nor do we do so here.

possible effect on the conclusion that defendant's use of force here—stabbing his unarmed sister three times in the back after she became embroiled in an altercation with Lansing and was stabbed by Lansing in the stomach—was far greater "than was reasonably necessary to defend against the threat" (*Hernandez, supra*, 51 Cal.4th at p. 747), and that his use of force was not " 'reasonable under the circumstances' " (*Minifie, supra*, 13 Cal.4th at p. 1065).

Moreover, nothing in the jury instructions *precluded* the jurors from considering Lansing's testimony about the 2018 incident in evaluating defendant's self-defense and defense-of-others claim and whether defendant's conduct and beliefs were reasonable. Among other things, the court instructed the jury, with regard to self-defense: "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant, and consider what a reasonable person in a similar situation with similar knowledge would have believed." (CALCRIM No. 3470.) Lansing's testimony about the 2018 incident indicated defendant intervened in both instances. Thus, this would have been a circumstance known to him. The court also instructed the jurors they were to decide what the facts were. (CALCRIM No. 200.)

We conclude there is not a reasonable probability defendant would have received a more favorable verdict had the jurors been given the bracketed instructions. Thus, defendant has not established prejudice.[8] (See *Strickland v. Washington, supra*, 466 U.S. at pp. 693-694; *People v. Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

---

[8] At the end of his argument on this issue, defendant raises his trial attorney's failure to marshal the facts concerning the prior attack in addition to counsel's failure to request the bracketed instructions. Even assuming this contention was properly raised, and even assuming counsel was ineffective for failing to argue the issue to the jury, for the same reasons discussed *ante*, defendant was not prejudiced as a result.

# III

## *Section 654*

Defendant asserts the matter must be remanded for resentencing under the newly amended version of section 654 so the court may exercise its discretion in sentencing him under that section. The Attorney General concedes defendant is entitled to remand for resentencing. We agree.

At the time defendant was sentenced, former section 654, subdivision (a) provided: "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, former subd. (a), as amended by Stats. 1997, ch. 410, § 1, p. 2753.) As amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.), which went into effect January 1, 2022, section 654 now provides: "[a]n act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions . . . .*" (§ 654, subd. (a), italics added.) Thus, as amended, where section 654 applies, that section now authorizes trial courts to exercise their discretion in choosing the count for which punishment will be imposed rather than requiring the longest potential term of imprisonment.

Defendant contends that, because his case is not yet final, he is entitled to the benefits of amended section 654. In *In re Estrada* (1965) 63 Cal.2d 740, the California Supreme Court held, "a statute that reduced the punishment for a crime applied retroactively to any case in which the judgment was not final before the statute took effect." (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303.) " 'The *Estrada*

---

Additionally, contrary to defendant's contention, for the reasons discussed in part I, *ante*, Lansing's verdict does not bolster his argument that counsel's failure to request the bracketed instructions was prejudicial.

rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*Id*. at p. 308.)

Assembly Bill No. 518 results in ameliorative changes with potential to impact defendant's sentence, it contains no indication the Legislature intended the amendment to apply prospectively only, and defendant's case was not final before amended section 654 went into effect. Under the circumstances of this case, we agree defendant is entitled to resentencing under the newly operative version of section 654 and, accordingly, we will remand the matter for resentencing.

## IV

### *Senate Bill No. 567*[9]

In supplemental briefing, defendant asserts the matter must be remanded for resentencing based on recent changes made to section 1170. Defendant asserts he is entitled to the benefit of the ameliorative changes to section 1170 under *Estrada*. He asserts that the matter must be remanded for the trial court to consider whether certain traumas he experienced were "a contributing factor in the commission of the offense" warranting imposition of low-term sentences. (§ 1170, subd. (b)(6), added by Stats. 2021, ch. 731, § 1.3.) The Attorney General agrees defendant is entitled to the ameliorative benefit of the statutory changes and that the matter therefore should be remanded for resentencing. We agree.

Senate Bill No. 567 added subdivision (b)(6) to section 1170. (Stats. 2021, ch. 731, §§ 1.3, 3.) Insofar as relevant here, section 1170, as amended, provides, in pertinent part: "Notwithstanding paragraph (1), and unless the court finds that the

---

[9] See footnote 2, *ante*.

24

aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶]  (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (§ 1170, subd. (b)(6).)  Senate Bill No. 567 "applies retroactively . . . as an ameliorative change in the law applicable to all nonfinal convictions on appeal."  (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039, fn. omitted; accord, *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109.)

We have already determined remand is required for the trial court to resentence defendant under the newly operative version of section 654.  Accordingly, we need not also consider defendant's contentions, and support therefor, concerning the specific grounds for his entitlement to resentencing pursuant to section 1170 as amended by Senate Bill No. 567.  At resentencing, the trial court shall also consider the applicability of section 1170, subdivision (b)(6) to defendant's case.

DISPOSITION

Defendant's convictions are affirmed.  The matter is remanded for resentencing in conformance with recently amended sections 654 and 1170, subdivision (b)(6).

 

 

/s/                    
HOCH, J.

We concur:

 

/s/                
ROBIE, Acting P. J.

 

/s/                
BOULWARE EURIE, J.